**Victor CAVAZOS, Appellant–Defendant,**

v.

**MIDWEST GENERAL METALS CORPORATION, Appellee–Plaintiff.**

No. 93A02–0209–EX–771.

Court of Appeals of Indiana.

March 4, 2003.

---

Ryan A. Beall, LaPorte, IN, Attorney for Appellant.

Kristen K. Rollison, Indianapolis, IN, Attorney for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

Victor Cavazos appeals the decision by the Worker's Compensation Board of Indiana (Board) ruling that Cavazos should receive no additional temporary total disability benefits (TTD benefits) and medical treatment from Midwest General Metals Corporation (Midwest). Specifically, Cavazos argues that the Board erred in finding that Midwest properly terminated his TTD benefits on the first two occasions because he refused the medical services provided to him and on the last two occasions because his injury had reached a permanent and quiescent state. Cavazos also argues that the Board erred in failing to order Midwest to provide additional medical services pursuant to the directive of an independent medical examiner.

Because we find that there is evidence that Cavazos refused the medical services

provided to him, that his injury had reached a permanent and quiescent state by the time of the final termination of his TTD benefits, and that Midwest provided the medical services recommend by the independent medical examiner, we affirm in part. However, because on some occasions Midwest did not promptly provide Cavazos the proper notice of the termination of his TTD benefits and on one occasion failed completely to provide the proper notice, we reverse in part and remand to the Board to calculate the TTD benefits that Cavazos was entitled to during that period that he was without proper notice of the terminations. In addition, we find that Cavazos is also entitled to the TTD benefits from one of his terminations because the independent medical examiner found that Cavazos's injury had not yet reached a permanent and quiescent state and Midwest did not contest that determination.

### Facts and Procedural History

Cavazos was an employee of Midwest with an average weekly wage of $251. On January 2, 1998, a steel beam fell on Cavazos while he was at work, fracturing his right ankle and causing severe contusions to his right forearm and both thighs. As a result of his injuries, metal screws and a metal plate were placed in Cavazos's right ankle. Midwest had notice of Cavazos's injury and immediately provided an authorized treating provider, Dr. William Biehl, and began paying TTD benefits at a rate of $167.46 per week. During the course of Cavazos's treatment, there was a diagnosis that he might be developing reflexive sympathetic dystrophy (RSD).

On April 24, 1998, Dr. Biehl terminated Cavazos's physical therapy and discharged Cavazos from his care after he became belligerent to him and his physical therapist. On May 22, 1998, Midwest's worker's compensation carrier (the Carrier) sus-pended Cavazos's TTD benefits because of Dr. Biehl's refusal to see him due to his verbal abusiveness. Tr. p. 168. On June 4, 1998, the Carrier sent Cavazos a Report of Claim Status (State Form 38911) giving notice of the suspension of his TTD benefits as well as a letter explaining that the suspension would continue until Cavazos began seeing another specified doctor. Tr. p. 172, 218–20. On July 7, 1998, Cavazos sought treatment from Dr. Annabelle Juhasz; however, Dr. Juhasz refused to see Cavazos because he insisted on having his wife in the examining room during the initial examination. Tr. p. 128. On July 15, 1998, the Carrier sent Cavazos a second State Form 38911 and a letter explaining that his benefits would remain suspended until he agreed to cooperate with the medical personnel retained by his employer. Tr. p. 221–22.

On July 31, 1998, Dr. Stephen Burns examined Cavazos and recommended that he see Dr. David Miller at the Woodland Pain Clinic for pain treatment. Cavazos began treatment with Dr. Miller on August 19, 1998. Tr. p. 124. After receiving a few treatments from Dr. Miller, Cavazos discontinued the treatment after the Carrier refused to reinstate his benefits. Cavazos returned to Dr. Miller in March of 1999, and on May 19, 1999, the Carrier reinstated Cavazos's TTD benefits. However, on July 12, 1999, the Carrier terminated Cavazos's benefits again after he missed physical therapy appointments on July 6 and 7, 1999, because of car trouble. Tr. p. 87–88. On August 9, 1999, Cavazos's benefits were reinstated.

On September 15, 1999, Cavazos's was sent to Dr. Jonathan Javors who conducted a bone scan. On October 15, 1999, Dr. Javors issued his opinion that Cavazos had a "15% foot impairment, a 10% lower extremity impairment, and a 5% whole person permanent partial impairment due to

the fracture which he suffered." Appellee's App. p. 49. Dr. Javors also noted that there might also be a psychological component to Cavazos's injury. Cavazos then began psychological treatment with Dr. Ara Yerestein. In May of 2000, Dr. Yerestein released Cavazos from treatment finding that there was no disability from a psychiatric standpoint. The Carrier terminated benefits on May 28, 2000, because Cavazos had been released from treatment, and a State Form 38911 was sent to Cavazos on June 4, 2000, notifying him of the termination of benefits. Tr. p. 209, 223. Upon receiving the notice, Cavazos requested an independent medical examination (IME) on June 8, 2000.

The IME took place on September 22, 2000. On October 2, 2000, the independent medical examiner issued his report finding that Cavazos was still not able to return to work as a result of the injury he received and that he considered Cavazos to be disabled for an indefinite period of time. Appellee's App. p. 58. The independent medical examiner noted that an anesthesiologist specializing in pain management should evaluate Cavazos's condition and chance for improvement, and he noted that there was a strong psychological component to Cavazos's condition. On October 6, 2000, the Ombudsmen of the Worker's Compensation Board ordered that Cavazos's "(TTD) benefits should be reinstated from the date of termination and paid until he reaches medical quiescence." Appellee's App. p. 67. The Carrier reinstated TTD benefits on October 6, 2000.

On November 28, 2000, Cavazos was examined by Dr. Timothy King for his pain. Dr. King believed that Cavazos "has a legitimate somatic pain source but it is probably more related to original injury and post-operative intervention than it is to an RSD problem." Tr. p. 153. Dr. King recommended that Cavazos undergo vocational rehabilitation, treatment from a mental health worker, and conservative medical care for his pain problem but not specialized pain management. Tr. p. 153–54. On January 18, 2001, Dr. Yerestein found that "Mr. Cavazos's problem with anxiety does not prevent him, in and by itself, from functioning in gainful employment." Appellee's App. p. 65. Cavazos's benefits were terminated on January 25, 2001, and a State Form 38911 was sent January 29, 2001. Tr. p. 225.

This case arises from an Application for Adjustment of Claim filed by Cavazos on October 26, 1998, following the first suspension of his benefits. A single member of the Board held a worker's compensation hearing on Cavazos's claim on February 1, 2001. At the hearing, the parties made stipulations including that Cavazos sustained a 15% permanent partial impairment to his right foot as a result of the accident, and the parties submitted Cavazos's medical records. The parties stipulated that the issues to be determined by the single member were:

> Whether the employee is entitled to temporary total disability benefits for any period of time between May 23, 1998 and May 18, 1999; July 13, 1999 and August 8, 1999; and May 29, 2000 and October 5, 2000;

> Whether the employee has reached a permanent and quiescent condition;

> Whether the employee has permanent restrictions;

> Whether the employer is obligated to provide any additional statutory medical treatment.

Appellee's App. p. 5.

On July 18, 2001, the single member entered an award adopting the parties' stipulations as its findings and further found:

that based upon the evidence submitted, the employer's termination of Plaintiff's benefits was proper and supported by credible medical evidence.

It is further found that this single Hearing Member is convinced that the employer provided reasonable and necessary medical care.

It is further found that Plaintiff sustained a fifteen percent (15%) permanent partial impairment to the right lower extremity.

Appellee's App. p. 6. The award ordered that Cavazos be compensated at the statutory rate for his fifteen percent permanent partial impairment of his right lower extremity and that he should take nothing further by way of his Application for Adjustment of Claim. Appellee's App. p. 6. Cavazos appealed the decision to the full Board. On May 28, 2002, the majority of the full Board adopted and affirmed the single member's decision. This appeal ensued.

### Discussion and Decision

On appeal, Cavazos argues that the Board erred in finding that Midwest properly terminated his TTD benefits on four different occasions: from May 23, 1998 to May 18, 1999; July 13, 1999 to August 8, 1999; May 29, 2000 to October 5, 2000; and after January 25, 2001. Cavazos also argues that the Board erred in failing to order Midwest to provide additional medical treatment pursuant to the Board's IME directive.

▆ On an appeal from a decision of the full Worker's Compensation Board, we are bound by the Board's findings of fact and may only consider errors in the Board's conclusions of law. *Luz v. Hart Schaffner & Marx,* 771 N.E.2d 1230, 1232 (Ind.Ct.App.2002) (citing Ind.Code Ann. § 22–3–4–8(b)), *reh'g denied, trans. denied.* We cannot disturb the Board's fac-

tual determinations unless we conclude that the evidence is undisputed and leads inescapably to a contrary result. *Id.* We may consider only that evidence which tends to support the Board's determination, together with any uncontradicted adverse evidence. *K–Mart Corp. v. Morrison,* 609 N.E.2d 17, 28 (Ind.Ct.App.1993), *trans. denied.* While this Court is not bound by the Board's interpretations of law, we should reverse only if the Board incorrectly interpreted the Worker's Compensation Act. *Luz,* 771 N.E.2d at 1232. We will construe the Worker's Compensation Act liberally in favor of the employee. *Id.*

▆ Cavazos argues that Midwest violated Indiana law on each occasion that it terminated his TTD benefits. The purpose of awarding temporary total disability payments under the Indiana Worker's Compensation Act is to compensate an employee for a loss of earning power because of an accidental injury arising out of, and in the course of, his or her employment. *Ballard v. Book Heating & Cooling, Inc.,* 696 N.E.2d 55, 57 (Ind.Ct.App.1998), *trans. denied.* If the injured worker does not have the ability to return to work of the same kind or character during the treatment period for the injury, the worker is temporarily totally disabled and may be entitled to benefits. *Id.* Once the injury has reached a permanent and quiescent state, however, the treatment period ends, and the extent of the permanent injury is assessed for compensation purposes. *Covarubias v. Decatur Casting, Div. of Hamilton Allied Corp.,* 171 Ind.App. 533, 536, 358 N.E.2d 174, 176 (1976). Thus, once the injury has stabilized to a permanent and quiescent state, temporary disability ceases, and the extent of permanent injury resulting in a degree of impairment or total disability is determined. *Id.*

Both parties agree that Midwest paid Cavazos TTD benefits during the following periods of time: January 3, 1998 to May 22, 1998; May 19, 1999 to July 12, 1999; August 9, 1999 to May 28, 2000; and October 6, 2000 to January 25, 2001. Midwest asserts that it properly terminated Cavazos's TTD benefits on the first two occasions because he refused to accept the medical services provided to him, and it asserts that it properly terminated the TTD benefits on the last two occasions because Cavazos reached a permanent and quiescent condition.

As to the first two terminations, Midwest directs us to Indiana Code § 22–3–3–4(c), arguing that the statute allows TTD benefits to be suspended based upon a refusal of medical services. In *Houchins v. Kittle's Home Furnishings,* 589 N.E.2d 1190, 1193 (Ind.Ct.App.1992), another panel of this Court addressed this issue and found that Indiana Code § 22–3–3–4(c) authorizes the suspension of TTD benefits based on the refusal of medical services. While we agree with that panel that TTD benefits can be terminated based on an unreasonable refusal of medical services, we disagree that Indiana Code § 22–3–3–4 is the statute that authorizes this type of benefit termination. Indiana Code § 22–3–3–4 provides in pertinent part:

> Sec. 4. (a) *After an injury and prior to an adjudication of permanent impairment,* the employer shall furnish or cause to be furnished, free of charge to the employee, an attending physician for the treatment of his injuries, and in addition thereto such surgical, hospital and nursing services and supplies as the attending physician or the worker's compensation board may deem necessary. If the employee is requested or required by the employer to submit to treatment outside the county of employment, the employer shall also pay the reasonable expense of travel, food, and lodging necessary during the travel, but not to exceed the amount paid at the time of the travel by the state to its employees under the state travel policies and procedures established by the department of administration and approved by the state budget agency. If the treatment or travel to or from the place of treatment causes a loss of working time to the employee, the employer shall reimburse the employee for the loss of wages using the basis of the employee's average daily wage.
>
> (b) *During the period of temporary total disability resulting from the injury,* the employer shall furnish the physician services, and supplies, and the worker's compensation board may, on proper application of either party, require that treatment by the physician and services and supplies be furnished by or on behalf of the employer as the worker's compensation board may deem reasonably necessary.
>
> (c) *After an employee's injury has been adjudicated by agreement or award on the basis of permanent partial impairment* and within the statutory period for review in such case as provided in section 27 of this chapter, the employer may continue to furnish a physician or surgeon and other medical services and supplies, and the worker's compensation board may within the statutory period for review as provided in section 27 of this chapter, on a proper application of either party, require that treatment by that physician and other medical services and supplies be furnished by and on behalf of the employer as the worker's compensation board may deem necessary to limit or reduce the amount and extent of the employee's impairment. *The refusal of the employee to accept such services and supplies, when provided by or on behalf of the employer,*

*shall bar the employee from all compensation otherwise payable during the period of the refusal, and his right to prosecute any proceeding under IC 22–3–2 through IC 22–3–6 shall be suspended and abated until the employee's refusal ceases. The employee must be served with a notice setting forth the consequences of the refusal under this section. The notice must be in a form prescribed by the worker's compensation board. No compensation for permanent total impairment, permanent partial impairment, permanent disfigurement, or death shall be paid or payable for that part or portion of the impairment, disfigurement, or death which is the result of the failure of the employee to accept the treatment, services, and supplies required under this section.* However, an employer may at any time permit an employee to have treatment for his injuries by spiritual means or prayer in lieu of the physician or surgeon and other medical services and supplies required under this section.

(emphases added). The panel in *Houchins* concluded that while the first part of subsection (c) only applies to the period of time after an employee's injuries have been adjudicated on the basis of permanent partial impairment, the refusal part of subsection (c) should apply to all of the statute and extends to the payment of TTD benefits; however, we respectfully disagree.

██ ██ The first part of subsection (c) details the medical services and supplies that an employer may continue or that the Board may require after there has been an award on the basis of permanent partial impairment. The refusal part of subsection (c) explicitly provides that compensation shall be suspended when there is then a refusal of "such services." Subsection (c) then goes on to list the compensa-

tion that is suspendable based on the refusal of medical services: permanent total impairment, permanent partial impairment, permanent disfigurement, or death. Unlike TTD benefits, the listed forms of compensation in subsection (c) are the type determined after a person's permanent impairment is adjudicated. Thus, we respectfully disagree with the *Houchins* panel and find that all of subsection (c), including the refusal part, only applies to the time period after an employee's injury has been adjudicated on the basis of permanent partial impairment, an event that occurs after the time period in which TTD benefits can be paid. Therefore, we conclude that the refusal provision in Indiana Code § 22–3–3–4(c) does not apply to TTD benefits.

██ Nevertheless, we still find that TTD benefits can be suspended or terminated based on an employee's unreasonable refusal of medical services. Indiana Code § 22–3–3–7 governs the payment of TTD benefits, and it provides in pertinent part:

(c) Once begun, temporary total disability benefits may not be terminated by the employer unless:

(1) the employee has returned to any employment;

(2) the employee has died;

(3) the employee has refused to undergo a medical examination under section 6 of this chapter or has refused to accept suitable employment under section 11 of this chapter;

(4) the employee has received five hundred (500) weeks of temporary total disability benefits or has been paid the maximum compensation allowed under section 22 of this chapter; or

(5) the employee is unable or unavailable to work for reasons unrelated to the compensable injury.

*In all other cases the employer must notify the employee in writing of the employer's intent to terminate the payment of temporary total disability benefits and of the availability of employment, if any, on a form approved by the board.* If the employee disagrees with the proposed termination, the employee must give written notice of disagreement to the board and the employer within seven (7) days after receipt of the notice of intent to terminate benefits. If the board and employer do not receive a notice of disagreement under this section, the employee's temporary total disability benefits shall be terminated. Upon receipt of the notice of disagreement, the board shall immediately contact the parties, which may be by telephone or other means, and attempt to resolve the disagreement. If the board is unable to resolve the disagreement within ten (10) days of receipt of the notice of disagreement, the board shall immediately arrange for an evaluation of the employee by an independent medical examiner. The independent medical examiner shall be selected by mutual agreement of the parties or, if the parties are unable to agree, appointed by the board under IC 22–3–4–11. If the independent medical examiner determines that the employee is no longer temporarily disabled or is still temporarily disabled but can return to employment that the employer has made available to the employee, or if the employee fails or refuses to appear for examination by the independent medical examiner, temporary total disability benefits may be terminated. If either party disagrees with the opinion of the independent medical examiner, the party shall apply to the board for a hearing under IC 22–3–4–5.

*Woehnker v. Cooper Tire & Rubber Co.,* 764 N.E.2d 688, 690–91 (Ind.Ct.App.2002)

(emphasis added). One of the "other cases" contemplated by Indiana Code § 22–3–3–7 is when an injury has stabilized to a permanent and quiescent state. *See id.* at 691. We find that another case in which an employer may terminate TTD benefits is when an employee unreasonably refuses to accept medical services. However, while the employer may terminate temporary total disability benefits without notice to the employee in certain instances (for example, death or reemployment), in all other circumstances, such as in this one, the employer must notify the employee and the Board of its intent to terminate benefits. *Cox v. Worker's Compensation Bd. of Ind.,* 675 N.E.2d 1053, 1056 (Ind. 1996). Thus, Indiana Code § 22–3–3–7 requires that the employer notify the employee of the consequence of refusing medical services—benefit termination.

▰▰▰ Midwest terminated Cavazos's TTD benefits for the first time from May 23, 1998 to May 18, 1999 because of medical noncompliance. While Cavazos argues that he accepted and cooperated with the treatment at that time, his argument is simply an invitation for us to reweigh the evidence, which is an invitation that we cannot accept. At the Board hearing, Midwest presented evidence that Cavazos was verbally abusive and threatening to his first doctor resulting in the termination of treatment and TTD benefits. Midwest also presented evidence that Cavazos failed to cooperate during his initial examination with Dr. Juhasz. Based on this evidence, we find that the Board did not err in deciding that Midwest could terminate Cavazos's TTD benefits for medical noncompliance. However, we note that while Cavazos's benefits were terminated on May 22, 1998, the proper form approved by the Board, a State Form 38911, was not sent to Cavazos until June 4, 1998, notifying him of the termination of benefits

because of medical noncompliance. As TTD benefits in this case could not be terminated until Cavazos was notified in writing on a form approved by the Board of Midwest's intent to terminate the payments, we find that Midwest could not terminate Cavazos's TTD benefits until June 4, 1998, when it sent a State Form 38911. *See Woehnker,* 764 N.E.2d at 689. Therefore, we find that while the Board properly found that Midwest could terminate Cavazos's benefits for refusal of medical services, we also find that Cavazos should nevertheless receive the TTD benefits that he was entitled to during the time between May 22, 1998 and June 4, 1998.

■■■ As to the second termination of TTD benefits based on medical noncompliance, we find that the Board erred in holding that Midwest's termination of benefits from July 13, 1999 to August 8, 1999 was proper. While Midwest presented evidence that Cavazos missed two physical therapy appointments, there was no evidence presented to the Board that Midwest properly notified Cavazos of its intent to terminate benefits on that occasion because of his medical noncompliance. In particular, there is no evidence that Midwest ever sent a State Form 38911 to Cavazos during the second termination of his TTD benefits. As the undisputed evidence before us leads inescapably to the conclusion that Cavazos did not receive the proper notice when Midwest terminated his benefits from July 13, 1999 to August 8, 1999, we find that the Board erred in finding that the termination on that occasion was proper.

■■■ Midwest's third termination of Cavazos's TTD benefits was based on evidence that Cavazos's injury had reached a permanent and quiescent state. The evidence before the Board reveals that Midwest terminated Cavazos's TTD benefits on May 28, 2000, after Dr. Javors issued his opinion that Cavazos had a 15% foot impairment, a 10% lower extremity impairment, and a 5% whole person permanent partial impairment due to the injury he received and after treatment ended for the psychological component of Cavazos's injury. On June 4, 2000, Midwest sent Cavazos a State Form 38911 notifying him of the termination and a few days later Cavazos requested an independent medical examination. The independent medical examiner found that Cavazos was still not able to return to work as a result of the injury he received, that he considered Cavazos to be disabled for an indefinite period of time, and that there was a strong psychological component to Cavazos's condition. On October 6, 2000, the Ombudsmen of the Worker's Compensation Board ordered that Cavazos's "(TTD) benefits should be reinstated from the date of termination and paid until he reaches medical quiescence." Appellee's App. p. 67. However, Midwest only reinstated Cavazos's TTD benefits starting October 6, 2000; it did not reinstate them from the date of termination, May 28, 2000. The record does not reveal that Midwest ever applied to the Board for a hearing in order to dispute the opinion of the independent medical examiner. Therefore, we find that the Board erred in finding that Midwest properly withheld Cavazos's TTD benefits from May 29, 2000 to October 5, 2000.

■■■ Midwest terminated Cavazos's TTD benefits for the fourth and final time on January 25, 2001, again asserting that Cavazos's injury had reached a permanent and quiescent state. A State Form 38911 was sent January 29, 2001. The record reveals that leading up to this final termination, Dr. King examined Cavazos and found that while Cavazos still had legitimate pain stemming from his injury, the recommended treatment should be vocational rehabilitation, treatment from a

mental health worker, and conservative medical care for his pain problem but not specialized pain management. Dr. King's opinion supports the inference that the pain element of Cavazos's injury had stabilized to a permanent state, that it would not improve so that Cavazos could return to his previous type of employment, and that only the psychological component of Cavazos's injury could be further improved. As to the psychological component, the evidence reveals that Dr. Yerestein found on January 18, 2001, that "Mr. Cavazos's problem with anxiety does not prevent him, in and by itself, from functioning in gainful employment." Appellee's App. p. 65. Based on this evidence, we find that the Board did not err in concluding that Midwest could terminate Cavazos's TTD benefits because his injury had reached a permanent and quiescent state. However, for reasons explained above, we find that Cavazos's TTD benefits should not have been terminated until January 29, 2001, the day the State Form 38911 was sent to him notifying him of the termination.

■ Cavazos also argues that the Board erred in failing to order Midwest to provide additional medical treatment pursuant to the Board's IME directive. However, the independent medical examiner only recommended that an anesthesiologist specializing in pain management should evaluate Cavazos's condition and chance for improvement and that Cavazos should undergo further psychological evaluation and treatment; both of these recommendations were followed. After it was found that the pain and psychological components of Cavazos's injury had reached a permanent and quiescent state, Midwest did not have to offer additional medical services and supplies unless it voluntarily chose to do so or was so ordered by the Board. *See* Ind.Code § 22–3–3–4(c). Be-

cause it is completely within the Board's discretion to order additional medical services after an award on the basis of permanent partial impairment, we find that the Board did not err in failing to order Midwest to provide additional medical treatment to Cavazos.

### Conclusion

We find that the Board did not err in allowing Midwest to terminate Cavazos's TTD benefits on the first and fourth occasion; however, we find that the termination of benefits on those two occasions could not occur until Cavazos received the proper notice of Midwest's intent to terminate benefits. We conclude that Cavazos should receive the TTD benefits that he was entitled to during that period that he was without proper notice of the terminations. Because Cavazos never received the proper notification during the second termination of his TTD benefits, he is entitled to all TTD benefits from that period. In addition, Cavazos is entitled to the TTD benefits from the third termination, because the independent medical examiner found that Cavazos's injury had not yet reached a permanent and quiescent state and Midwest did not contest that determination at that time. However, we find that Cavazos is not entitled to additional medical services. Therefore, we affirm in part, reverse in part, and remand with instructions to calculate and award the TTD benefits to which Cavazos is entitled.

Affirmed in part, reversed in part, and remanded with instructions.

NAJAM and DARDEN, JJ., concur.