FILED
May 19 2016, 7:44 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



| ATTORNEY FOR APPELLANT | ATTORNEY FOR APPELLEE |
|---|---|
| Nathan V. Maudlin | Gary P. Goodin |
| Klezmer Maudlin, P.C. | Goodin Orzeske & Blackwell, P.C. |
| New Harmony, Indiana | Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Steven M. Bush, | May 19, 2016 |
| *Appellant-Claimant,* | Court of Appeals Case No. 93A02-1508-EX-1299 |
| v. | Appeal from the Indiana Worker's Compensation Board |
| Robinson Engineering & Oil, Co., Inc., | The Honorable Linda Peterson Hamilton, Chairman |
| *Appellee-Respondent.* | Application No. C-206276 |

**Kirsch, Judge.**

[1] Steven M. Bush ("Bush") appeals an order issued by the full Indiana Worker's Compensation Board ("the Board") that adopted the single hearing member's findings and conclusions, which determined that Bush did not sustain a cervical injury, or exacerbate his cervical spine condition, during an August 2010 on-the-job accident. Bush raises one issue that we restate as: whether the Board

was required to follow the treatment recommendations of the independent medical examiner who saw Bush after his employer, Robinson Engineering & Oil, Co., Inc. ("Robinson"), notified Bush of its intent to terminate temporary total disability benefits.

[2]     We affirm.

## Facts and Procedural History

[3]     While working as an electrical technician for Robinson, Bush suffered a compensable work-related injury on August 13, 2010 ("August 2010 injury"), while pushing or "wrestling" the company's 14-foot boat that was floating in the Ohio River, in order "to get the boat back on the trailer" after the engine had died. *Tr.* at 17; *Appellant's App.* at 61. In October 2010, Bush's attorney wrote a letter to Robinson informing it that he had been hired to represent Bush in the worker's compensation case stemming from the August 2010 injury, stating that Bush had sustained "an injury to his low back." *Appellant's App.* at 108. In November 2010, Bush gave a recorded statement to an insurance adjuster, explaining how the work injury occurred and describing his pain as "lower back" pain. *Id.* at 76.

[4]     Bush was initially treated by his family physician, David E. Schultz, II, M.D. and, in December 2010, Bush sought worker's compensation benefits by filing an Application for Adjustment of Claim. Thereafter, as part of the worker's compensation case, Bush saw Ross W. Whitacre, M.D. ("Dr. Whitacre") on March 2, 2012, for evaluation. During the examination, Bush described to Dr.

Whitacre how the August 2010 injury had occurred, and he described his symptoms to Dr. Whitacre, who reported, "[H]e tells me that his only complaints are unrelenting back pain that ebbs and flows depending on activity and time of day." *Id*. at 86.

[5] With regard to medical history and any prior injuries, Bush reported to Dr. Whitacre that he had been in a motor vehicle accident in 2005. Following the car accident, Bush had treated with William A. Ante, M.D. ("Dr. Ante") and John O. Grimm, M.D. ("Dr. Grimm") at Tri-State Orthopaedics. Dr. Whitacre reviewed the medical records related to the treatment Bush received after the car accident. Those reports indicated that, following the car accident, Bush complained of: neck pain, mid-back and low back pain, bilateral upper limb pain, and bilateral lower limb pain. *Id*. at 41, 45, 48, 50. By May 2006, Bush described to Dr. Ante that the pain in his neck and in his low back "are equal." *Id*. at 46. Dr. Ante's impressions included: cervical sprain, cervicalgia, cervical spondylosis, and cervical disc displacement of C4-C5, C5-C6, and C6-C7. *Id*. at 43, 46, 54, 57. On March 13, 2006, Bush had an MRI that revealed some cervical spine issues, including "advanced spondylosis anteriorly at C4-C5 and C5-C6" and "hard disc at the left C6-C7 level[.]" *Id*. at 48, 56, 63. In February 2007, Dr. Ante directed Bush to see a primary care physician to monitor him, and, alternatively, he instructed Bush to come back to see him in four months. Thereafter, Bush saw Dr. Ante in June 2007 for a follow-up appointment and indicated that his symptoms were "about the same" as they had been, noting that his neck "still crunches and cracks with pain." *Id*. at 60. In his March

2012 evaluation appointment with Dr. Whitacre, Bush told him that he was "completely better" and "completely recovered from" the 2005 car accident. *Id.* at 87.

[6] After his examination of Bush and review of his medical records, Dr. Whitacre prepared a report, stating that the diagnosis was "lumbar spondylosis," noting that Bush described pain as "similar" to that which Bush described having after the 2005 auto accident, "with the exception of his minimal cervical complaints currently." *Id.* at 87. Dr. Whitacre characterized the August 2010 injury as an exacerbation of an existing injury and said that Bush was not at maximum medical improvement. *Id.* at 87-88. However, Dr. Whitacre indicated that Bush "could return to work at this time with mild restrictions" on the amount of weight that he could lift.[1] *Id.* at 88. He recommended x-rays and physical therapy. Following Dr. Whitacre's report, Robinson deemed Bush's injury compensable, paid temporary total disability ("TTD") benefits to Bush,[2] and authorized James W. Butler, M.D. ("Dr. Butler") to treat Bush for his work injury.

---

[1] The record before us reflects that Robinson terminated Bush from employment shortly after the August 2010 injury. *Appellant's App*. at 78-79, 85, 91.

[2] The purpose of awarding TTD payments under the Indiana Worker's Compensation Act is to compensate an employee for his loss of earning power because of an accidental injury arising out of, and in the course of, his employment. *Platinum Constr. Grp., LLC v. Collings*, 988 N.E.2d 1153, 1156-57 (Ind. Ct. App. 2013) (citing Indiana Code § 22-3-2-2(a) and *Ballard v. Book Heating & Cooling, Inc.,* 696 N.E.2d 55, 57 (Ind. Ct. App. 1998), *trans. denied).*

[7]     In March 2013, Bush saw Dr. Butler for evaluation and treatment, and at that time, Bush complained of back pain and numbness in his extremities, including his left arm and hand. Dr. Butler's assessment was "lumbar spondylosis" and he recommended that Bush participate in physical therapy, quit opiates, and come back to see him in five weeks. *Id.* at 92. Bush returned to see Dr. Butler on April 18, 2013, and he had completed the recommended physical therapy. Bush reported to being sore and told Dr. Butler that he has problems with his arms going to sleep. Dr. Butler asked Bush about "a previous EMG that showed that he had possible carpal tunnel and ulnar neuropathy," but Bush stated he believed the issues were related to the lower back area. *Id.* at 94. Dr. Butler's report noted that Bush was "not presently working," although having been released to do so with weight-lifting restrictions, and that Bush reported that "no one will hire him" and "he has not been looking" for employment. *Id.* Dr. Butler placed Bush at maximum medical improvement, and he issued a Permanent Partial Impairment ("PPI") Rating by separate report.

[8]     In the PPI report, Dr. Butler stated that his diagnosis was "lumbar spondylosis," Bush suffered from an "aggravation" of a previous condition, and determined that Bush had a 3% whole person PPI rating. *Id.* at 96. Following, Dr. Butler's report, Robinson notified Bush that it intended to terminate the TTD benefits. Thereafter, pursuant to Indiana Code section 22-3-3-7, Bush requested an independent medical examination ("IME"). As part of that process, counsel for Bush wrote to the Worker's Compensation Board; in that letter, counsel stated that Bush "suffered injury to his lower back" and was "still

experiencing" "low back pain," as well as "bilateral hip pain" and "occasional right foot numbness." *Id.* at 111. The Board appointed Rick Sasso, M.D. ("Dr. Sasso") to perform the IME.

[9] On June 26, 2013, Dr. Sasso performed Bush's IME. When Bush met with Dr. Sasso, he complained of "low back pain" occurring "in a constant pattern" for three years, which included aching and sharp pain and sometimes numbness to the right foot. *Id.* at 99. Bush also told Dr. Sasso that he had difficulty sleeping, explaining that, if on his back, he feels numbness in his arms or they start "hurting really badly[.]" *Tr.* at 7. As part of his IME, Dr. Sasso reviewed medical records prior to and after the August 2010 work injury. Dr. Sasso was aware of and reviewed prior evaluation and treatment, diagnostic tests, including a 2006 MRI to cervical spine, a 2006 MRI to lumbar spine, and the March 2013 spine x-ray; he noted that Bush had not received treatments for the August 2010 injury until April 2013 when he underwent physical therapy sessions. Dr. Sasso's report said that Bush's "current symptoms are related to an on-the-job injury." *Id.* at 101. The report further stated, "I do not believe the claimant has reached a medical quiescence in regards to this injury," and Dr. Sasso recommended that Bush have an MRI to his lumbar and cervical spine. *Id.* Thereafter, in July 2013, counsel for the parties exchanged email communications about the matter, and because Dr. Sasso's IME recommended a cervical MRI, Robinson agreed to provide it, but stated that "any recommendations related to the cervical area will be objected to since that has

never been at issue in this case." *Id*. at 114. Bush's counsel responded, "Fair enough." *Id*.

[10] On August 7, 2013, Bush had a cervical MRI and a lumbar MRI. After reviewing the cervical and lumbar scans, Dr. Sasso issued a report on August 24, 2013, following the MRI, stating that the MRI revealed issues with Bush's cervical spine, or neck area, including: a significant disc bulge or osteophyte at the C6-C7 level and a herniation at C3-C4. *Id*. at 106. Dr. Sasso opined that these issues may be causing "significant neural compromise" and recommended that Bush be seen by a spinal surgeon with expertise in cervical spine disorders, continuing, "The question is whether these abnormalities in the cervical MRI scan are causing his present symptoms." *Id*. at 106.

[11] Robinson filed an objection to the IME report and requested a hearing. *Id*. at 2. Prior to the hearing, the parties submitted a Joint Stipulation, which provided, in part, that the issues to be determined were the following:

> Whether Plaintiff is at maximum medical improvement for his work-related exacerbation of a preexisting lumbar injury occurring on August 13, 2010.

> Whether Plaintiff's cervical condition arose out of Plaintiff's work-related exacerbation of a preexisting lumbar injury occurring on August 13, 2010.

*Id*. at 38.

[12]     A hearing was held before single hearing member Andrew S. Ward on February 10, 2014. At the hearing, Bush testified, among other things, to his "current symptoms," stating, "I still have back ache. Left arm goes to sleep all the time . . . especially when I sleep at night." *Tr.* at 9. Bush testified to having been in a car accident in 2005, but said that at some point that same year he was released from treatment and returned to employment, working for an electrical company for several years. After that, he began working at Robinson, where he worked for a couple of weeks until the August 2010 injury. Bush testified that he had not been able to return to work since the August 2010 injury. Upon cross examination, Bush acknowledged that when he spoke to the insurance adjuster in November 2010, he did not mention that he was experiencing any issues with his neck, nor did he mention any neck issues in a signed and notarized statement that he provided after the August 2010 accident. Bush's request to the single hearing member was to be able to see a spine surgeon for evaluation and treatment of his cervical spine, as Dr. Sasso had recommended.

[13]     At the conclusion of the February 10, 2014 hearing, counsel for Robinson argued:

> From the day of this injury forward up until the date of the IME, there's never been any mention of any cervical injury either by [Bush] or by his counsel or by any treating doctor. Every treating doctor has made the same diagnosis, a lumbar spondylosis.

*Id.* at 20. Counsel further asserted that the results of the March 2006 MRI, taken after the 2005 car accident, are "almost identical" to the MRI results of the cervical spine taken after the IME, arguing that Bush was attempting to obtain worker's compensation benefits for the injuries to the cervical spine suffered in the 2005 motor vehicle accident. *Id.* at 21. For this reason, Robinson's position was that any cervical treatment be denied as part of the worker's compensation case.

[14] On September 8, 2014, the single hearing member issued Findings of Fact, Conclusions of Law and Award, which included the following two findings: (1) Bush was at maximum medical improvement for his work-related exacerbation of his lumbar condition; and (2) Bush failed to persuade the single hearing member "that Bush suffered an injury to his cervical spine on the occasion of his August 13, 2010 work injury nor that any of the injuries he sustained at that time have resulted in an exacerbation of this cervical spine condition." *Appellant's App.* at 9. The single hearing member concluded, in part, "[Bush] did not suffer an exacerbation, or any other injury, of his cervical spine during or as a result of his August 13, 2010 work injury," and Bush "did not suffer a compensable cervical injury as a result of his work accident." *Id.* at 10. Bush timely filed his Application for Review with the Full Board. Following a June 2015 hearing, the Full Board affirmed and adopted the single hearing member's decision. Bush now appeals.

## Discussion and Decision

Bush argues that the Board erred when it "ignore[d] the opinion" of Dr. Sasso, who performed the IME and effectively substituted "its own medical judgment," when it failed to follow Dr. Sasso's recommendations. *Appellant's Br.* at 1, 4; *Reply Br.* at 1. His argument is that, when an employer provides notice of its intent to terminate TTD benefits, and, thereafter, the employee requests an IME, Indiana's worker's compensation statutory scheme creates a presumption that the IME's opinion is correct. Thus, Bush argues, Dr. Sasso's recommendation for additional evaluation and treatment of his cervical spine was presumptively correct, and the Board erred when it did not accept it.

When we review a decision of the full Worker's Compensation Board, we are bound by the Board's factual determinations and will not disturb them unless the evidence is undisputed and leads inescapably to a contrary conclusion. *Platinum Constr. Grp., LLC v. Collings*, 988 N.E.2d 1153, 1156 (Ind. Ct. App. 2013). We neither reweigh evidence nor judge witness credibility. *Id.* Rather, we must disregard all evidence unfavorable to the decision and examine only the probative evidence and reasonable inferences supporting the Board's findings. *Id.* On questions of law, the reviewing court should only reverse if the Board incorrectly interpreted the Worker's Compensation Act. *Cavaznos v. Midwest Gen. Metals*, 783 N.E.2d 1233, 1239 (Ind. Ct. App. 2003). In seeking review of the Board's adverse determination, Bush appeals from a negative judgment, and we have recognized, "A negative award may be sustained by an absence of evidence favorable to the claimant's contentions or by the presence

of evidence adverse to the claimant's contentions." *Smith v. Bob Evans Farms, Inc.*, 754 N.E.2d 18, 23 (Ind. Ct. App. 2001), *trans. denied* (additional quotations omitted).

[17] Bush recognizes that, in general, the Board is free to accept or reject expert testimony,[3] but, he argues, in the situation when the Board appoints an IME after an employee requests it pursuant to Indiana Code 22-3-3-7, the opinion of the independent medical examiner is presumed correct, and if a party does not present contrary evidence to rebut that presumption, the independent medical examiner's recommendations must be followed. Bush's argument is thus rooted in what he maintains is a statutory presumption, and he asks us to find that one exists. We employ "'a deferential standard of review to the interpretation of a statute by an administrative agency charged with its enforcement in light of its expertise in the given area.'" *E. Alliance Ins. Grp. v. Howell*, 929 N.E.2d 922, 926 (Ind. Ct. App. 2010) (quoting *Christopher R. Brown, D.D.S., Inc. v. Decatur Cnty. Mem'l Hosp.,* 892 N.E.2d 642, 646 (Ind. 2008)). Furthermore, we are mindful of the following when interpreting a statute:

> [O]ur ultimate goal is to ascertain the legislature's intent and interpret the statute so as to effectuate that intent. The best evidence of legislative intent is the language of the statute itself, and courts strive to give the words in a statute their plain and ordinary meaning. A statute should be examined as a whole, avoiding excessive reliance upon a strict literal meaning or the

---

[3] *See Appellant's Br.* at 8 (citing *Hill v. Worldmark Corp./Mid Am. Extrusions Corp.*, 651 N.E.2d 785,787 (Ind. 1995)).

selective reading of individual words. We presume that the legislature intended for the statutory language to be applied in a logical manner consistent with the statute's underlying policy and goals.

*Id.* (internal citations omitted).

[18] Indiana Code section 22-3-3-7 governs the payment of TTD benefits, and it provides, in pertinent part, that TTD benefits may not be terminated by the employer except in defined circumstances, including but not limited to where the employee has returned to employment, has died, or refused to undergo a medical examination. Ind. Code § 22-3-3-7(c). "In all other cases," the employer must notify the employee in writing of its intent to terminate the payment of TTD benefits.[4] *Id*. If the employee disagrees with the proposed termination of benefits, he or she must give written notice of the disagreement to the Board and the employer; thereafter, the Board "shall immediately contact the parties" and "attempt to resolve the disagreement," but if the Board is unable to resolve the disagreement within ten days, it "shall immediately arrange for an evaluation of the employee by an independent medical examiner." *Id*. The independent medical examiner shall be selected by mutual agreement of the parties or, if the parties are unable to agree, appointed by the Board. *Id*.

---

[4] One of the "other cases" contemplated by Indiana Code section 22-3-3-7 is when an injury has stabilized to a permanent and quiescent state. *Cavazos v. Midwest Gen. Metals Corp.*, 783 N.E.2d 1233, 1242 (Ind. Ct. App. 2003) (citing *Woehnker v. Cooper Tire & Rubber Co.,* 764 N.E.2d 688, 691 (Ind. Ct. App. 2002)).

[19]    Bush maintains that, from the language of Indiana Code section 22-3-3-7, it can be inferred that the opinion of the IME is presumed correct and "is to be followed." *Appellant's Br*. at 4, 6. In support of his proposition, Bush directs us to the portion of subsection (c) that states:

> If the independent medical examiner determines that the employee is no longer temporarily disabled or is still temporarily disabled but can return to employment that the employer has made available to the employee, . . . temporary total disability benefits may be terminated.

Ind. Code § 22-3-3-7(c). This language, he asserts, reflects the conclusive effect of the IME: if the independent medical examiner determines the employee is no longer disabled or can return to employment, then the employer may terminate the TTD benefits. Bush urges that subsection (d) likewise indicates that the IME opinion is presumptively correct because it states that an employer is not required to continue payments of TTD benefits "unless the independent medical examiner determines that the employee is temporarily disabled and unable to return to any employment[.]" Ind. Code § 22-3-3-7(d). Although citing to no case law in support, Bush argues that, read together, subsections (c) and (d) create a rebuttable presumption that the opinion of the IME is correct, and unless the party who disagrees with the IME presents evidence to rebut the presumption, the IME recommendation must be followed. Bush claims that, here, "there is no competent evidence specifically rebutting [Dr. Sasso's] opinion," and, therefore, the Board erred as a matter of law by denying Dr. Sasso's recommended treatment of Bush's cervical spine. *Appellant's Br*. at 4.

We disagree both that the statutes create a rebuttable presumption in favor of the IME's opinion and that there was no evidence contrary to Dr. Sasso's opinion.

[20] While Indiana Code section 22-3-3-7(c) provides that an employee may request an IME if he or she disagrees with the employer's plan to terminate TTD benefits, at which time the Board "shall immediately arrange for an evaluation of the employee by an independent medical examiner," the subsection further expressly provides a mechanism for disputes concerning the IME. It states:

> If either party disagrees with the opinion of the independent medical examiner, the party shall apply to the board for a hearing under IC 22-3-4-5.

Ind. Code § 22-3-3-7(c). If, as Bush suggests, the IME's opinion presumptively is correct and is to be followed, then there would be no need for a hearing. The plain language of the statute establishes the right of either party to disagree with the opinion of the independent medical examiner, and in such cases, that party may request a hearing.

[21] To the extent that Bush argues there was no expert medical testimony in the record that was contrary to Dr. Sasso's opinion,[5] which suggested that Bush's then-existing symptoms "are related" to the August 2010 on-the-job injury, we

---

[5] Although Bush argues that "[t]here was no evidence rebutting Dr. Sasso's report," he also acknowledges, "Dr. Sasso . . .disagreed with the other doctors in this case." *Appellant's Reply Br.* at 6, 9.

are not persuaded. *Appellant's App*. at 101. The record before us contains evidence that, following the August 2010 incident, Bush did not complain of cervical or neck issues and no doctor diagnosed a cervical injury. Rather, when seeking worker's compensation benefits, Bush alleged a lower back injury from pushing and wrestling with the boat in the water on August 13, 2010. This is what he told his attorney, the insurance adjuster, his family physician, as well as Dr. Whitacre, who he saw for evaluation after he filed his worker's compensation application for benefits. According to Dr. Whitacre's report, Bush complained of low back pain, and Dr. Whitacre diagnosed Bush with lumbar spondylosis. Following that evaluation, Robinson accepted the injury as compensable and approved Bush to receive treatment from Dr. Butler, who also diagnosed Bush with lumbar spondylosis. By April 2013, Dr. Butler placed Bush at maximum medical improvement and provided a 3% whole person PPI rating. When Robinson notified Bush of its intent to terminate TTD benefits, Bush requested an IME, and the Board appointed Dr. Sasso. Following his June 2013 evaluation of Bush, approximately three years after the work-related injury, Dr. Sasso recommended a cervical MRI and a lumbar MRI. Robinson agreed to the MRI scans but notified Bush that it would object to any cervical treatment as the cervical area "was never at issue in this case." *Id*. at 8. Whether an injury arises out of and in the course of employment is generally a question of fact for the Board. *Waters v. Ind. State Univ.*, 953 N.E.2d 1108, 1113 (Ind. Ct. App. 2011), *trans. denied*. Here, there was a "presence of evidence adverse to [Bush's] contentions" and, ultimately, we agree with Robinson that "the Board was free to reject Dr. Sasso's reports as not credible or rely on the

other evidence in the record that contradicted Bush's claim of cervical injury" as having occurred on, or been exacerbated by, the August 13, 2010 incident. *Smith*, 754 N.E.2d at 23; *Appellee's Br*. at 6. Accordingly, we affirm the decision of the Board concluding that Bush did not suffer a compensable cervical injury in the August 2010 incident and denying Bush's claim for additional evaluation of and treatment to his cervical spine.

[22] Affirmed.

[23] Riley, J., and Pyle, J., concur.