**FOR PUBLICATION**



ATTORNEY FOR APPELLANT

**EDWARD C. LAWHEAD**
Schreiner, Malloy & Etzler, P.C.
Highland, Indiana

ATTORNEYS FOR APPELLEE:

**LIBBY VALOS MOSS**
**MARK D. GERTH**
Kightlinger & Gray, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JEFF REEVES, | ) | |
| | ) | |
| Appellant-Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 93A02-1107-EX-604 |
| | ) | |
| CITIZENS FINANCIAL SERVICES, | ) | |
| | ) | |
| Appellee-Defendant. | ) | |

APPEAL FROM THE INDIANA WORKER'S COMPENSATION BOARD
Cause No. C-166381

**January 26, 2012**

**OPINION - FOR PUBLICATION**

**CRONE, Judge**

**Case Summary**

Jeff Reeves sustained a back injury while working for Citizens Financial Services ("Citizens Financial"). Over the course of several years, Citizens Financial paid for a variety of medical treatments, but Reeves still experienced pain in his back that radiated into his left leg. After an evidentiary hearing, a single hearing member of the Worker's Compensation Board ("the Board") determined that Reeves had reached maximum medical improvement ("MMI"), had a permanent partial impairment ("PPI") of five percent, and was not entitled to ongoing palliative care. Reeves appealed to the Board, which adopted the decision of the single hearing member. Reeves now appeals the Board's decision, arguing that the Board erroneously concluded that he was not entitled to additional palliative care. Because Reeves has failed to identify what type of care he should receive and because the undisputed evidence does not show that palliative care limits the extent of his impairment, we affirm.

**Facts and Procedural History**

On February 13, 2003, Reeves was employed by Citizens Financial as a maintenance worker. On that day, he was involved in an automobile accident while working in the course and scope of his employment. After the accident, Reeves complained of pain in his neck, lower back, left hip, and legs. Reeves reported the accident to Citizens and was directed to the emergency room at Community Hospital in Munster. His lower back was x-rayed, and the x-ray revealed no fractures, spondylolisthesis, or spondylolysis. He was discharged with instructions to apply ice to his back and follow up with his primary care physician.

On February 18, 2003, Reeves saw his primary care physician, Dr. Albert Willardo.

2

Dr. Willardo took Reeves off work and ordered an MRI. The MRI, which was performed on March 3, 2003, did not reveal any significant findings.

Reeves continued to experience pain, and Citizens referred him to Dr. Aashish Deshpande. Reeves complained of continued pain in his lower back radiating into his left leg to the knee. Dr. Deshpande believed that Reeves's symptoms were consistent with a lumbar strain injury and possible sciatic or pudendal nerve irritation. Dr. Deshpande prescribed a muscle relaxer, an anti-inflammatory medication, and Vicodin. He recommended a physical therapy and exercise program and imposed a ten-pound lifting restriction. Reeves returned to work with restrictions on March 8, 2003.

Reeves returned to Dr. Deshpande on April 14, 2003. He had been doing well in physical therapy and was showing improvement. Dr. Deshpande continued his medications and released Reeves for full duties at work. At his next appointment on May 5, 2003, Reeves reported having stiffness and soreness in his back since returning to regular duties. Dr. Deshpande imposed a thirty-five-pound lifting restriction and recommended physical therapy and medication.

On June 5, 2003, Reeves was laid off due to a reduction in force. By that time, he was showing no significant improvement. Dr. Deshpande believed that Reeves's symptoms were more consistent with radiculopathy than the lumbar strain that he had initially diagnosed.[1] Dr. Deshpande referred him to Dr. Ghassan S. Nemri for an epidural steroid injection, which

---

[1] According to MedlinePlus, a website maintained by the National Institute of Health, "radiculopathy" is "any pathological condition of the nerve roots." MedlinePlus Medical Dictionary, www.nlm.nih.gov/medlineplus/mplusdictionary.html (last visited Jan. 9, 2012).

was administered on June 12, 2003. When he still showed no significant improvement, he was referred back to Dr. Nemri for an S1 transforaminal epidural injection, which was administered on July 17, 2003.[2]

After the second injection, Reeves continued to complain of pain in his back, buttocks, left thigh, and left calf. Dr. Deshpande took him off work and added Neurontin to his medication regimen.[3] Reeves still showed no improvement after taking Neurontin. As of August 4, 2003, Dr. Deshpande felt that "we are getting close to reaching maximum medical improvement," and described Reeves's prognosis for improvement as "fair, at best." Record Vol. III at 19.[4] Dr. Deshpande prescribed OxyContin to help manage the pain.

On August 12, 2003, Reeves underwent a Functional Capacity Evaluation performed by physical therapist Robert Hoyt. Hoyt indicated that Reeves qualified in the "very heavy" category for lifting. *Id*. at 115. However, Hoyt acknowledged that Reeves had "some true discomfort," which increased with repeated lifting. *Id*. at 120. Hoyt found paresthesia at the L5, S1 dermatome level and showed signs of radiculopathy in his left leg. Hoyt felt that Reeves would benefit from a home exercise or physical therapy program.

On August 29, 2003, Reeves returned to Dr. Deshpande. Reeves indicated that his

---

[2] According to Reeves, the purpose of the injections was to "deaden the nerve." Record Vol. I at 9.

[3] Reeves was still unemployed at this point, and it appears that he remained unemployed until about December 2005, when he started working as a welder. Restrictions given by Reeves's doctors during this time are mentioned simply to indicate the doctors' opinions as to his capabilities.

[4] The record consists of three volumes. Volume I is the transcript of the hearing before the single hearing member, Volume II contains the parties' stipulations, and Volume III contains Reeves's medical records. The medical records are grouped together by the health care provider and are labeled with letters; however, the pages are also consecutively numbered. For ease of locating quotations from the medical records, we will cite to the page number rather than the exhibit letter.

pain was "minimally better" after physical therapy. *Id*. at 21. Dr. Deshpande concluded that Reeves had reached MMI and had a PPI rating of five percent. His final diagnosis was chronic lumbosacral strain injury and bilateral lower extremity nerve irritation. Dr. Deshpande imposed a lifting restriction of seventy-five pounds and provided him with one month's worth of prescriptions. He directed Reeves to get any refills from his primary care physician.

Reeves disagreed with Dr. Deshpande's conclusions and received an independent medical examination by Dr. Robert Martino. Dr. Martino noted that Reeves complained of pain in his back and left leg and that he had some limitation of motion. Dr. Martino gave a preliminary diagnosis of lumbosacral radiculitis and ordered an electromyograph ("EMG") of both legs.

On November 5, 2003, Dr. Julian Ungar-Sargon conducted the EMG. Dr. Ungar-Sargon indicated that the EMG showed "a very focal S1 radiculopathy on the left side adequately explaining the radicular nature of his pain into the buttock." *Id*. at 143. Based on the EMG results, Dr. Martino opined that Reeves was not at MMI and should consult a spine surgeon about possible corrective surgery at the L5, S1 disc space. Dr. Martino ordered Reeves to stay off work until consulting a surgeon.

On January 6, 2004, Reeves was evaluated by Dr. Alexander C. Miller, an orthopedic spine surgeon. He believed that Reeves's "subjective complaints are out of proportion to the objective physical signs." *Id*. at 32. He ordered a new MRI and ordered Reeves to remain off work until the MRI could be evaluated. He prescribed Bextra and instructed Reeves to

5

begin a home exercise program.

Reeves returned to Dr. Miller on January 21, 2004. Dr. Miller concluded that Reeves did not have a "surgically remediable spinal disorder." *Id*. at 34. He discontinued Bextra due to side effects and ordered him to take an over-the-counter NSAID. He ordered Reeves to continue his home exercise program. Shortly thereafter, Dr. Miller concluded that Reeves had reached MMI and could return to work full-time without restrictions.

However, Reeves continued to experience pain and had periodic appointments with Dr. Willardo. On September 29, 2004, he was referred to Dr. D. L. Fortson. Dr. Fortson diagnosed an S1 radiculopathy based on the EMG, which showed "an acute focal moderate severity S1 root irrigation." *Id*. at 40. Dr. Fortson wanted Reeves to have a myelogram to rule out a lesion, which could be amenable to surgery. Dr. Fortson assigned a PPI of five percent, but strongly cautioned that this figure "in no way reflects the patient's full impairment." *Id*. at 41. In other words, Dr. Fortson felt that five percent was "numerically accurate" based on the AMA's Guide to the Evaluation of Permanent Impairment, but was "prognostically and clinically inaccurate." *Id*.

On April 19, 2005, Reeves was evaluated by Dr. K. J. Singh, who doubted the findings of an S1 radiculopathy and did not think a myelogram would reveal any type of nerve compression. He opined that Reeves's lower back pain was consistent with internal disc disruption and disc degeneration. Dr. Singh explained that disc degeneration can cause fluid to leak from the disc and cause a chemical irritation of the nerve root. He noted that a diskogram could help pinpoint the problem, but did not recommend one because Reeves's

6

"surgical options are poor and surgical results are poor for this condition."[5] *Id.* at 45. He did not believe that further injections or medications were a good way to proceed. He concluded that Reeves was at MMI as to his back and had a PPI of zero percent.

Reeves petitioned the Board to order a myelogram, which had been recommended by Dr. Fortson. The Board ordered a myelogram, and Reeves was referred back to Dr. Martino. Dr. Martino reevaluated Reeves on November 17, 2006, and reaffirmed his earlier opinion that there was "focal L5, S1 involvement, S1 nerve root on the left." *Id.* at 28. Dr. Martino recommended a diskogram, and Reeves was referred to Dr. Ravi Kanakamedala.

Dr. Kanakamedala's initial impression was an L5, S1 central bulge and left lumbar radicular pain. He recommended a transforaminal epidural steroid injection and a lumbar paraspinal muscle trigger point injection. The pain did not improve after those injections. After an examination on January 8, 2007, Dr. Kanakamedala's impression was lumbar facet pain and internal disc disruption contributing to low back axial pain. He recommended a lumbar facet diagnostic medial branch block, which was administered on January 22, 2007. Reeves did not get much relief from the medial branch block, and Dr. Kanakamedala next ordered a diskogram. A diskogram and a CT scan were performed on March 1, 2007. Dr. Kanakamedala's notes show that Reeves did not complain of any pain reproduction during the diskogram. The diskogram and CT scan revealed a tear in the inner annular fibrosis.

---

[5] A diskogram is "a radiograph of an intervertebral disk made after injection of a radiopaque substance." MedlinePlus Medical Dictionary, www.nlm.nih.gov/medlineplus/mplusdictionary.html (last visited Jan. 9, 2012). At some places in the record, it is spelled "discogram," which also appears to be an accepted spelling. *See id.*

After reviewing the results, Dr. Kanakamedala's impression was lumbar radiculitis at the L5, S1 level and an inner annulus tear of the L5, S1 disc. As of March 30, 2007, Dr. Kanakamedala opined that Reeves had "reached MMI as [far as] the pain management is concern[ed]." *Id*. at 93. He further opined that Reeves had a PPI of five percent.

Reeves continued to experience pain and was referred to Dr. Anton Thompkins, an orthopedic surgeon. Dr. Thompkins examined Reeves on May 14, 2007, and also reviewed his medical records. Dr. Thompkins believed that the source of the pain had not been identified because the "studies right now do not explain the symptoms he is having presently." *Id*. at 130. Dr. Thompkins recommended that Dr. Richard Cristea do an EMG as an independent evaluator. The EMG showed an absent left H-reflex and evidence of a left S1 radiculopathy. Based on the two EMGs showing an S1 radiculopathy, Dr. Thompkins diagnosed Reeves with chronic radiculopathy non-structural in nature. Dr. Thompkins felt that surgery was not recommendable and that Reeves would need continued treatment with "nonoperative measures, occasional medication and pain tolerance techniques." *Id*. at 136. He opined that Reeves had a PPI, but did not give his opinion as to the percentage that should be assigned.

Reeves was next referred to Dr. Joan K. Szynal. Dr. Szynal noted that Reeves's complaints had been consistent throughout the course of his medical treatment and were consistent with the left S1 radiculopathy shown by the EMGs. She did not believe he was a good candidate for surgery and recommended medication management and traction. She opined that he should have work restrictions of minimal twisting and bending at the waist and

8

no lifting over twenty-five pounds. As of September 2, 2009, Dr. Szynal was unsure about whether Reeves had reached MMI or had a PPI, but she thought that the previous PPI rating of five percent was probably reasonable. At a follow-up appointment with Dr. Szynal on September 17, 2009, Reeves reported that traction had increased his pain. Dr. Szynal thought that result was "interesting" and ordered an MRI of his hip. *Id*. at 128. Dr. Szynal discontinued traction and recommended physical therapy.

The MRI revealed an anterosuperior labral tear, and Reeves was referred to Dr. Michael A. Yergler. Dr. Yergler recommended a left hip arthroscopy, which he performed on January 19, 2010. Dr. Yergler's diagnoses after the surgery were left hip and cam impingement, complex degenerative tear of the anterior superior labrum, moderate synovitis, a small area of cartilage delamination of the weightbearing dome of the acetabulum. Reeves was ordered to remain off work until his follow-up appointment. Reeves participated in physical therapy, and the therapist reported that he was experiencing less pain and had good rehabilitation potential.

Reeves saw Dr. Yergler again on March 24, 2010. He reported that his left leg still hurt and that his right hip and leg were beginning to hurt. Dr. Yergler opined that Reeves had reached MMI in his left hip, had a PPI of zero percent, and could return to regular work duties. However, Dr. Yergler acknowledged that Reeves had "some pain posteriorly which is a sciatic-type pain and a positive straight leg raise and is tender over the lumbar spine and S1 joint region." *Id*. at 111. Dr. Yergler opined that Reeves may need further evaluation for his posterior sciatic pain. Dr. Yergler advised that Reeves should avoid strenuous activities,

continue his present treatment plan, and continue physical therapy.

The parties were unable to agree on the extent of Citizens Financial's liability for any further treatment, and the case came before a single hearing member of the Board on September 9, 2010. The foregoing facts were taken from Reeves's medical records, which were admitted at the hearing by stipulation of the parties. The parties stipulated that the issues were: (1) whether Reeves had reached MMI for his back injury; (2) whether he had reached MMI for his hip injury; (3) whether he was entitled to any further statutory benefits, including palliative care; and (4) whether he has a PPI.

Reeves testified that his back "feels like … it's glass, like it's going to shatter on me" and that his left hip "still hurts just as bad as the day that it happened to me." Record Vol. I at 14. He stated that his right hip has become sore from compensating for his left hip. He disputed the statement in Dr. Kanakamedala's records that he had not experienced pain during the diskogram. Reeves testified that he was laid off from a welding job in November 2009 and was still unemployed. He was still taking Vicodin and Valium to help control the pain.

The single hearing member issued his order on December 1, 2010. He found that Reeves had reached MMI as to his back and hip. As to palliative care and PPI, the single hearing member reached the following conclusion:

> The issue of whether Plaintiff is entitled to palliative care or future medical care is prominently in dispute between the parties. Plaintiff states that "All five treating physicians referenced above recommended some form of continued treatment, in varying degrees, for Plaintiff Reeves' continued complaints." If that were to be the present case, there is no question but that Plaintiff would be entitled to some future medical or palliative care. However,

10

the evidence indicates otherwise. Plaintiff requested the Board to obtain an independent medical examination and the Board appointed Dr. Martino to evaluate Plaintiff. As a result of Dr. Martino's examination Plaintiff was directed to seek treatment from Dr. Kanakamedala, a pain management specialist. After nearly four months of actively and aggressively treating Plaintiff, Plaintiff's own submission states that "Dr. Kanakamedala's ***final impression*** was that Plaintiff suffered from lumbar radiculitis at the L5-S1 disc level and an inner annulus rear of the L5-S1 disc, but that ***he had reached MMI as far as pain management was concerned.*** Dr. Kanakamedala went on to assign the Plaintiff a 5% PPI of the whole person." These findings are persuasive that Plaintiff is not entitled to any additional medical or palliative care but that he is entitled to the value of a 5% PPI rating of the whole person.

Appellant's App. at 29-30 (citation omitted).

Reeves appealed the decision to the Board, which adopted the single hearing member's opinion in full on June 8, 2011. Reeves now appeals.

**Discussion and Decision**

Reeves challenges the Board's ruling that he is not entitled to ongoing palliative care. The Board, as the trier of fact, has a duty to issue findings that reveal its analysis of the evidence and that are specific enough to permit intelligent review of its decision. *Shultz Timber v. Morrison*, 751 N.E.2d 834, 836 (Ind. Ct. App. 2001), *trans. denied*. In evaluating the Board's decision, we employ a two-tiered standard of review. First, we review the record to determine if there is any competent evidence of probative value to support the Board's findings. *Id*. We then assess whether the findings are sufficient to support the decision. *Id*. We will not reweigh the evidence or assess witness credibility. *Id*.

Reeves, as the claimant, had the burden to prove a right to compensation under the Worker's Compensation Act. *Bowles v. Gen. Elec.*, 824 N.E.2d 769, 772 (Ind. Ct. App. 2005), *trans. denied*. As such, he appeals from a negative judgment. When reviewing a

11

negative judgment, we will not disturb the Board's findings of fact unless we conclude that the evidence is undisputed and leads inescapably to a contrary result, considering only the evidence that tends to support the Board's determination together with any uncontradicted adverse evidence. *Cavazos v. Midwest Gen. Metals Corp.*, 783 N.E.2d 1233, 1239 (Ind. Ct. App. 2003). "While this court is not bound by the Board's interpretations of law, we should reverse only if the Board incorrectly interpreted the Worker's Compensation Act." *Luz v. Hart Schaffner & Marx*, 771 N.E.2d 1230, 1232 (Ind. Ct. App. 2002), *trans. denied*. "We will construe the Worker's Compensation Act liberally in favor of the employee." *Id.*

In support of his argument that he is entitled to continuing palliative care, Reeves cites *Grand Lodge Free & Accepted Masons v. Jones*, 590 N.E.2d 653 (Ind. Ct. App. 1992). In that case, Susan Jones injured her back while working as a dish room employee for the Lodge. The Board ruled that Jones had a PPI of ten percent and that the Lodge had to continue paying for the TENS units that Jones used to manage her pain. The Board found that Jones's physician's PPI rating "took into consideration the use of a TENS unit, which unit is utilized to reduce pain, and pain is an element of a permanent partial impairment rating." *Id*. at 654. On appeal, the Lodge argued that the Board lacked authority to order it to pay for the TENS units. We affirmed the Board's decision, which made explicit findings that Jones's pain was reduced by using TENS units and that the reduction in pain would limit the extent of her impairment. In other words, her PPI would have been higher than ten percent without palliative treatment. We held that the Board had authority to order payment

12

for palliative care – in addition to a PPI award – when the palliative care limits the extent of impairment. *Id.* at 655-56.

We note that the Board's written decision here did not focus on the critical issue – whether the doctors who assigned a five-percent PPI took palliative care into account. The Board treated Dr. Kanakamedala's report as clear proof that no further palliative care was needed. However, during the time that Reeves was seeing Dr. Kanakamedala, he was also seeing Dr. Willardo approximately once a month and obtaining prescriptions for Vicodin and Valium from him. It appears that Reeves was seeing Dr. Kanakamedala primarily to explore options other than medication, and Dr. Kanakamedala's records are simply silent as to whether medication would be beneficial or affect the extent of his impairment.

Reeves notes that five other doctors recommended some form of additional care. Dr. Deshpande, who assigned a PPI of five percent, gave him one month's worth of prescriptions and directed him to see his primary care physician for any refills needed. Dr. Miller assigned no PPI, but did direct Reeves to take an over-the-counter NSAID as needed. Dr. Thompkins did not assign a specific PPI rating, but he did opine that Reeves would need continued treatment with "nonoperative measures, occasional medication and pain tolerance techniques." Record Vol. III at 136. Dr. Yergler assigned a PPI of zero percent as to Reeves's hip, but stated that Reeves may need evaluation for sciatic pain and that he should continue his "present treatment plan." *Id.* at 111. It is not clear from Dr. Yergler's report what treatment plan was in place at that time. Finally, Dr. Willardo on several occasions gave his opinion that Reeves would need pain medication on an ongoing basis. Reeves

13

testified that he was taking Vicodin and Valium, which were prescribed by Dr. Willardo. However, Dr. Willardo's office visit records stop at December 13, 2007, and Reeves does not explain this discrepancy.

Citizens Financial notes that Dr. Singh found no PPI and did not think that continued use of medication or injections was advisable. Citizens Financial argues that Reeves has not specified what type of treatment he thinks he should receive and that none of the doctors' opinions clearly indicate that palliative care would reduce the extent of his impairment.

We agree that Reeves has failed to specify what treatment he believes he needs. *Cf. Grand Lodge*, 590 N.E.2d at 656 (holding that Board's decision that Grand Lodge must pay for a TENS unit for as long as it was prescribed by a particular doctor or his successor was clear and unambiguous). Unlike *Grand Lodge*, the evidence in this case is conflicting as to whether palliative care – be it medicine, physical therapy, or some other measure – reduces the extent of the impairment. As Reeves is appealing a negative judgment, he must show that the evidence is undisputed and leads inescapably to the opposite result. He has not met that burden; therefore, we affirm the Board's decision.

Affirmed.

MAY, J., and BROWN, J., concur.