**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**RANDAL M. KLEZMER**
Klezmer Maudlin, PC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**ANTHONY K. FINALDI**
Fogle Keller Purdy PLLC
Louisville, Kentucky

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DANA BANKS | ) | |
| | ) | |
| Appellant-Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 93A02-1307-EX-600 |
| | ) | |
| EVANS LIMESTONE CO., | ) | |
| | ) | |
| Appellee-Defendant. | ) | |

APPEAL FROM THE WORKER'S COMPENSATION BOARD OF INDIANA
The Honorable Linda Peterson Hamilton, Chairman
Cause No.C-201110

**May 27, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**MATHIAS, Judge**

This appeal arises from the Worker's Compensation Board's ("the Board") denial of Dana Banks' ("Banks") Petition for Lack of Diligence, which was filed against his employer, Evans Limestone, who refused to authorize a spinal cord stimulator procedure that was recommended by three physicians. Banks raises three issues, which we consolidate as the following two:

I. Whether the Board abused its discretion when it appointed an Independent Medical Examiner to review Banks' request for a spinal cord stimulator; and,

II. Whether the Board erred when it denied Banks' request to order Evans Limestone to authorize the spinal cord stimulator procedure and denied his accompanying Petition for Lack of Diligence.

We affirm.

**Facts and Procedural History**

Banks' employment history consists of truck driving and physical labor. On August 8, 2007, in the course and scope of his employment with Evans Limestone, Banks suffered a lower back injury with radicular symptoms into his right leg.[1] Dr. Thomas Leipzig diagnosed Banks with recurrent disc extrusion at L4-L5 and new disc extrusion and L5-S1. Therefore, on November 7, 2007, Banks underwent a discectomy at L4-L5 and L5-S1.

Banks was then referred to Dr. Jose Vitto for pain management. Due to continuing pain, in 2009, both Drs. Leipzig and Vitto recommended that Banks undergo an assessment for implantation of a spinal cord stimulator. Evans Limestone then sent Banks to Dr. Scott Taylor for a third opinion concerning the possibility of spinal cord

---

[1] Banks had a prior back injury and underwent a laminectomy in April 2006, and his symptoms from the prior injury had resolved before he was injured in August 2007.

stimulation. All three doctors recommended a trial spinal cord stimulator if Banks received clearance from his cardiologist.

Banks has a history of coronary artery disease and suffered a heart attack in 1986. Also, in 2008, before the possibility of a spinal cord stimulator was discussed, Banks suffered a stroke. Banks received clearance from his cardiologist on January 6, 2010.

Evans Limestone then hired Dr. Robert Wiemer, a utilization review physician to review Banks' medical records. On January 18, 2010, Dr. Wiemer declined to certify the spinal cord stimulator procedure because Banks was benefitting from the external stimulator and had not received psychiatric clearance.

Because Evans Limestone refused to authorize the spinal cord stimulator procedure, Banks filed an adjustment of claim on July 19, 2010, and subsequently filed a Petition for Lack of Diligence on September 27, 2010. The Single Hearing Member of the Board then ordered Banks to undergo an independent medical examination with Dr. Kevin Macadaeg at Evans Limestone's expense. Dr. Macadaeg concluded that it was highly doubtful that a spinal cord stimulator would "make Mr. Banks any less 'disabled.'" Appellant's App. p. 69. After his visit with Dr. Macadaeg, Banks underwent an MRI. The doctor reviewed those test results and then concluded that Banks had reached maximum medical improvement.

Banks continued to see Dr. Taylor for pain management. Dr. Taylor never wavered in his opinion that Banks was a candidate to try a spinal cord stimulator. Dr. Taylor believed that Banks would require long-term pain medication management for the

3

rest of his life. He also opined that Banks was "permanently and totally disabled from any type of vocational productivity." Appellant's App. p. 73.

On January 24, 2013, Banks' Application for Adjustment of Claim was heard by a Single Hearing Member. On March 20, 2013, the Hearing Member issued her findings of fact and conclusions of law. Specifically, the Hearing Member found:

> 3. After the work accident, Plaintiff was directed to Dr. Leipzig, his physician for the prior surgery, who diagnosed a recurrent disc extrusion at L4-5 and a new disc extrusion at L5-S1. Plaintiff ultimately underwent another surgery. Thereafter, Dr. Leipzig referred Plaintiff to Dr. Vitto for pain management. On April 10, 2009, Dr. Vitto referred Plaintiff to Dr. Layton for a neuropsychological examination to determine if he was a candidate for a spinal cord stimulator. Plaintiff also Dr. Leipzig again in July of 2009, who recommended that Plaintiff undergo an assessment for the possibility of a spinal cord stimulator.
>
> 4. Defendant was sent to Dr. Taylor for a second opinion. On August 12, 2009, Dr. Taylor recommended a spinal cord stimulator trial and long-term medications. On October 7, 2009, Dr. Taylor noted that Plaintiff was not a candidate for a spinal cord stimulator until he was cleared by his cardiologist, and therefore, he recommended a 4-I external stimulator. Dr. Taylor released him from his care on December 16, 2009.
>
> 5. On January 4, 2010, Dr. Leipzig reiterated his opinion that Plaintiff should attempt a trial spinal cord stimulator, if he was able to get clearance from his cardiologist, but otherwise he was at maximum medical improvement and had sustained a 13% whole person impairment. On January 6, 2010, Plaintiff received clearance from his cardiologist to attempt the spinal cord stimulator.
>
> 6. Plaintiff's medical records were subsequently reviewed by a peer review physician, Dr. Robert Wiemer, who stated that the spinal cord stimulator was non-certified because Plaintiff was benefitting from the external stimulator and had not received psychiatric clearance. There was very little rationale for this opinion and it is given no weight.
>
> 7. Plaintiff's petition for penalties due to Defendant's lack of diligence was filed on September 27, 2010, which was argued before the Board and an IME was ordered at Defendant's expense. Plaintiff was seen by Board

4

appointed Independent Medical Examiner, Dr. Kevin Macadaeg. Dr. Macadaeg noted that overall Plaintiff's signs and symptoms did []² appear valid. Dr. Macadaeg recommended a repeat MRI and Lyrica. Dr. Macadaeg opined that because Plaintiff's back pain was more significant than the lower extremity pain that he doubted a spinal cord stimulator would make him less disabled, and therefore, he was hesitant to consider it.

8. Plaintiff underwent an MRI on February 4, 2011, which revealed diffuse spondylosis, multilevel degenerative disc disease, and no apparent nerve impingement or other gross instability. Thereafter, Dr. Macadaeg opined that Plaintiff was at maximum medical improvement and recommended no other medical treatment.

9. On May 24, 2011, Plaintiff underwent an FCE. The evaluator deemed Plaintiff's effort unreliable, with inappropriate illness behavior. The evaluator determined that Plaintiff could engage in work in the light to medium categories.

10. Plaintiff continued to see Dr. Taylor who opined that Plaintiff was at maximum medial improvement on July 8, 2011, and opined that he continues to need chronic pain management for his failed back syndrome. Plaintiff was taking, at that time, Fentanyl patches and Norco as needed.

11. On December 27, 2011, Plaintiff's records were reviewed by Dr. Christopher Brigham. Dr. Brigham found that Plaintiff had a 13% impairment, but only 3% should be apportioned to the work accident.

12. On May 22, 2012, Dr. Taylor issued a report in which he disagreed with Dr. Macadaeg regarding the opinion on the spinal cord stimulator. He concurred it is used more typically for leg pain, but new technologies have made it more successful in covering back pain. Dr. Taylor also opined that Plaintiff was permanently totally disabled because his condition was chronic and limits his ability to engage in physical activities, even with light duty. He also opined that Plaintiff was likely to need long-term pain medication to limit or reduce his impairment. Dr. Taylor alleged that Dr. Macadaeg's opinion should be discredited because he does not use spinal cord stimulation in his practice.

13. Plaintiff began seeing Dr. Allan MacKay on May 23, 2012, who at first noted that he believed that Plaintiff was a candidate for a spinal cord

---

² The Full Board corrected this finding, which originally stated that "Dr. Macadaeg noted that overall Plaintiff's signs and symptoms did not appear valid." See Appellant's App. pp. 7, 20.

5

stimulator, but later determined that Plaintiff was not a spinal cord stimulator candidate based on the conclusions of Dr. Macadaeg and the objective testing. He also noted that Plaintiff should continue with Dr. Taylor because he would not prescribe the same narcotic medications.

14. Plaintiff underwent a vocational assessment with Michael Blankenship on September 27, 2010. Blankenship determined that based on Plaintiff's significant degree of impairment, radiation into both lower extremities, and the restrictions that Plaintiff reported, that he was unable to sustain any reasonable type of employment.

15. Plaintiff was evaluated by Shari Deogracias for a vocational assessment on August 5, 2011. Deogracias disagreed with Blankenship and noted that Blankenship did not have the FCE from 2011 and did not refer to any other medical restrictions. Deogracias determined that based on the FCE that Plaintiff was able to secure several available positions in the light to medium work categories, and therefore, was not permanently totally disabled.

\*\*\*

18. Plaintiff complains of ongoing pain and difficulty with his legs giving way, he is using a Fentanyl patch and Norco as needed.

Appellant's App. pp. 6-9.

The Hearing Member concluded that Banks was at maximum medical improvement and that

> [t]he opinion of Dr. Macadaeg is given more weight in this matter as an independent medical examiner. Additionally, the issues of Plaintiff's invalid pain complaints and the decreased lack of success of the spinal cord stimulator with individuals who have primarily back pain, persuades the hearing member that the possible benefit of the spinal cord stimulator does not outweigh the high risk presented by Plaintiff's other medical conditions.

Id. at 9. The Hearing Member concluded that Banks was entitled to ongoing pain management as determined by an Evans Limestone authorized physician, but that Banks had not met his burden of proving that he is permanently totally disabled. The Hearing Member determined that Banks' "impairment is relatively minor, and he has been

6

provided very little medical restrictions on his activity. Additionally, he has a variety of medical conditions, some post-accident, which affect his functional capabilities." Id. Banks was awarded $18,035 for his 13% permanent partial impairment. Finally, the Hearing Member declined to award an additional amount for lack of diligence concluding that although Evans Limestone's "use of utilization review to supplant the opinion of two attending physicians is inadvisable, in this circumstances, the ultimate opinion of the Board and the Board appointed IME is in line with the actions" taken by Evans Limestone. Id. at 10.

Banks appealed the Hearing Member's decision to the Board and a hearing was held before the Board on May 13, 2013. The Board adopted the Hearing Member's decision, and with regard to Banks' lack of diligence claim, the Board additionally concluded that "[a] determination of bad faith cannot be premised solely on poor judgment exercised by the Defendant, especially in circumstances such as these where the Board finds in favor of the Defendant, and concluding that the treatment that was not provide to Plaintiff was unnecessary." Appellant's App. p. 16. Banks now appeals.

**Standard of Review**

Banks faces a deferential standard of review in his attempt to challenge the Board's findings. Smith v. Bob Evans Farms, Inc., 754 N.E.2d 18, 22 (Ind. Ct. App. 2001), trans. denied. This court is bound by the factual determinations of the Board and we will not disturb them unless the evidence is undisputed and leads inescapably to a contrary conclusion. Id. Moreover, it is the claimant's burden to prove a right to compensation under the Worker's Compensation Act. Id. at 23. In reviewing a decision

made by the Board, we will not reweigh the evidence or assess the credibility of the witnesses. K–Mart Corp. v. Morrison, 609 N.E.2d 17, 27 (Ind. Ct. App. 1993), trans. denied.

We also note that in seeking appellate review of the Board's adverse determination, Banks is appealing from a negative judgment. A negative award may be sustained by an absence of evidence favorable to the claimant's contentions or by the presence of evidence adverse to the claimant's arguments. Smith, 754 N.E.2d at 22.

## I. Independent Medical Examiner

First, we address Banks' argument that the Single Hearing Member abused her discretion when she ordered an Independent Medical Examiner to review Banks' case. Indiana Code section 22-3-4-11 provides that a Single Hearing Member "may . . . appoint a disinterested and duly qualified physician or surgeon to make any necessary medical examination of the employee and to testify in respect thereto."

> The Board is necessarily vested with wide discretion in deciding whether to appoint on its own a disinterested physician and hear additional testimony beyond the record of the Single Hearing Member before it. In deciding whether to hear additional evidence, "its action will not be disturbed on appeal unless the record shows an abuse of discretion."

Hilltop Concrete Corp. v. Roach, 174 Ind. App. 100, 105, 366 N.E.2d 218, 221-22 (1977) (citation omitted).

Banks argues that the Board's "'wide discretion' should not extend so far as to enable the Board to order a fourth physician to determine an issue already settled by three others." Appellant's Br. at 24. However, Banks never raised a contemporaneous objection to the Single Hearing Member's decision to appoint an IME. Banks also

8

stipulated to the admissibility to the IME's conclusion that "Banks was [at] MMI from a 'minimally invasive therapeutic standpoint or for any diagnostic work-up.'" Appellant's App. p. 5; see also Appellee's App. p. 4 (noting that the stipulations were admitted with no objection). For these reasons, we conclude that Banks has waived this issue for review. See Albright v. Four Winds Intern., 950 N.E.2d 1251, 1258 (Ind. Ct. App. 2011), trans. denied.

## II. Diligence

Banks argues that the Board erred when it denied his petition for lack of diligence, and that he is entitled to a spinal cord stimulator trial. Because these issues are intertwined we address them together below.

Pursuant to Indiana Code section 22-3-4-12.1, the Board has exclusive jurisdiction "to determine whether the employer, the employer's worker's compensation administrator, or the worker's compensation insurance carrier has acted with a lack of diligence, in bad faith, or has committed an independent tort in adjusting or settling the claim for compensation." Banks argues that the Board conflates "lack of diligence" with "bad faith," and therefore, the Board erred when it failed to find that Evans Limestone acted with lack of diligence when it refused to authorize the spinal cord stimulator recommended by three physicians.

Our court has made clear that "bad faith" and "lack of diligence" are distinct allegations. "'[A] finding of bad faith requires evidence of a state of mind reflecting a dishonest purpose, moral obliquity, furtive design, or ill will. Poor judgment and negligence . . . do not amount to bad faith; the additional element of conscious

9

wrongdoing must be present.'" Eastern Alliance Ins. Group v. Howell, 929 NE.2d 922, 926 (Ind. Ct. App. 2010) (quoting Ag One Co-op v. Scott, 914 N.E.2d 860, 864 (Ind. Ct. App. 2009)). However, "a lack of diligence requires no conscious wrongdoing by the actor." Id. at 926-27.

> To act with "diligence" is to act with "caution or care" or "the attention and care required of a person." Hence, to act with a "lack of diligence" is to act without the degree of attention and care required of a person. Stated affirmatively, a lack of diligence is a failure to exercise the attention and care that a prudent person would exercise. That is, to act with a lack of diligence is to act negligently.

Id. at 927 (citation omitted).[3] The plain language of Indiana Code section 22-3-4-12.1(a) "distinguishes 'lack of diligence' from 'bad faith' and permits the Board to assess punitive damages on the basis of lack of diligence alone." See id.

Banks was injured in 2007, but he was not assessed as a possible candidate for a spinal cord stimulator until 2009. In 2009, Banks was using an external 4-I interferential stimulator, and his pain level was 4 out of 10 on the scale. Dr. Thomas Leipzig referred Banks to Dr. Jose Vitto due to his continuing complaints of pain in his lower back and legs. Dr. Vitto determined that Banks was "probably a good candidate for spinal cord stimulation to try to alleviate his symptoms." Appellant's App. p. 58. Dr. Leipzig also opined that Banks was possibly a candidate for spinal cord stimulation if he could stop

---

[3] In Eastern Alliance Insurance Group, we also observed:
> [o]ur use of the term "negligence" is simply as a synonym to the statutory phrase "lack of diligence." We do not hold that, in order for a party to demonstrate that an entity has acted with a lack of diligence, that party must formally demonstrate the elements of the tort of negligence. Had the General Assembly sought such a result, it would have clearly stated so and not have used the alternative phrase of "lack of diligence" in Section 12.1(a).

929 N.E.2d at 927 n. 3.

taking his anticoagulants for ten to twelve days. Dr. Leipzig did not believe that Banks would have "significant and continued benefit from" selective nerve blocks.

In January 2010, Dr. Taylor determined that Banks might benefit from a spinal cord stimulator, but only if his cardiologist would give clearance for Banks to stop taking his anticoagulants for several days before and after the procedure given Banks' history of heart attack and stroke. Dr. Taylor also observed:

> In my experience with spinal cord stimulation, although it is difficult to know with any certainty, I would anticipate the benefit with pain at best would bring the individual pain down to a mild rating which would be somewhere around a 3-4 on a pain visual analog scale. It may allow the individual to decrease medication usage as well, but again this is difficult to predict.

Appellant's App. p. 39. Banks' cardiologist cleared Banks for the spinal cord stimulator trial on January 6, 2010.

It is not clear from the record on which date Evans Limestone sought utilization review on Banks' request for a spinal court stimulator, but the utilization review doctor's report[4] was issued on January 18, 2010, less than two weeks after Banks received clearance from his cardiologist.

Evans Limestone then refused to authorize the procedure. Banks did not file his adjustment of claim until July 19, 2010, and his Petition for Lack of Diligence was not filed until September 27, 2010. In Evans Limestone's response, the company explained that it did not authorize the procedure, in part, due to the medical risks and because Dr.

---

[4] The Board noted that there was very little rationale for the opinion and gave it no weight. We agree with this assessment. Appellant's App. p. 7.

11

Taylor had stated that Banks would need clearance from his cardiologist and neurologist, but only the cardiologist had given clearance for the procedure.[5]

The Board appointed Dr. Kevin Macadaeg an Independent Medical Examiner at Evans Limestone's expense. Any delay in case that resulted from the Board's appointment of the IME cannot be attributed to Evans Limestone.

Dr. Macadaeg disagreed with Dr. Taylor, and opined that, because Banks' back pain was more significant than the lower extremity pain, he doubted "a spinal cord stimulator would make him less disabled[.]" Id. at 69. Dr. Taylor agreed that Banks was not an ideal candidate for the spinal cord stimulator because it is typically used for those who suffer from leg pain, but recent advances "with spinal cord stimulator technology have made it more successful in covering back pain." Id. at 73. Dr. Taylor also stated that Dr. Macadaeg's opinion lacked significant value because he does not use spinal cord stimulators in his practice and is not a "big proponent of stimulator intervention." Id. at 83-84.

Finally, Dr. Taylor referred Banks to Dr. Allan Mackay as a possible physician closer to Banks' home to take over his care. Dr. Mackay initially stated that Banks was a candidate for a spinal cord stimulator. However, after he was made aware of Dr. Macadaeg's opposing conclusion, Dr. Mackay changed his own opinion.

Dr. Taylor, and the two doctors who evaluated Banks before him, opined that Banks was "possibly" or "probably" a good candidate for a spinal cord stimulator trial.

---

[5] It is not clear on the record whether the neurologist ever authorized the procedure, or whether Dr. Taylor later considered the cardiologist's clearance enough to proceed with a trial spinal cord stimulator.

12

Dr. Taylor admitted that Banks was not an ideal candidate because Banks' pain was worse in his lower back. The doctors agreed that spinal cord stimulators are more effective for treating leg pain, although advances in technology have made them more effective for treating back pain. Also, the risks of the procedure are greater for Banks due to his other medical problems, especially his cardiovascular issues.

The Board relied on the IME's opinion in reaching its conclusion that "the questionable lack of success of a spinal cord stimulator with individuals who have primarily back pain, persuades the hearing member that the possible benefit of the spinal cord stimulator does not outweigh the high risk presented by Plaintiff's other medical conditions." Appellant's App. p. 15. It was well within the Board's discretion to do so. See Smith, 754 N.E.2d at 22; K–Mart Corp., 609 N.E.2d at 27. Moreover, it is worth reiterating that Banks's only evidence on this issue was that the spinal cord stimulator would possibly provide him pain relief, and he was not an ideal candidate for the procedure.

The Board's decision to deny Banks' petition for lack of diligence is supported by the evidence because Banks did not receive clearance for the spinal cord stimulator trial from his cardiologist until January 6, 2010. For this reason, the delay attributable to Evans Limestone prior to that date by sending Banks to multiple physicians for additional opinions on whether to proceed with the spinal cord stimulator cannot be considered lack of diligence. The Board's determination that Banks failed to prove lack of diligence is also proper because the Board determined that his request for a spinal cord stimulator trial was not warranted under the circumstances of this case. Cf. Ag One Co-op v. Scott,

13

914 N.E.2d 860, 863 (Ind. Ct. App. 2009) (quoting Borgman v. Sugar Creek Animal Hospital, 782 N.E.2d 993, 998 (Ind. Ct. App. 2002), trans. denied (observing that the "'allegation that [the worker's compensation insurance carrier]'s actions constituted bad faith necessarily fails because [the employee] did not meet her burden of proof of the underlying claim that she was improperly denied worker's compensation benefits'")).

**Conclusion**

Although Evans Limestone's decision to seek multiple doctors' opinions and utilization review of Banks' request for a spinal cord stimulator caused delay in this case, that delay does not amount to lack of diligence because that delay occurred before Banks received clearance from his cardiologist for the procedure and because the Board's decision to deny Banks' request for the procedure is supported by the IME's opinion. It is well-settled that we will not disturb the Board's findings of fact unless we conclude that the evidence is undisputed and leads inescapably to a contrary result, considering only the evidence that tends to support the Board's determination together with any uncontradicted adverse evidence. See Cavazos v. Midwest Gen. Metals Corp., 783 N.E.2d 1233, 1239 (Ind. Ct. App. 2003). Because there is evidence supporting the Board's findings of fact and conclusions of law, we must affirm.

Affirmed.

FRIEDLANDER, J., and PYLE, J., concur.

14