## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Apr 20 2020, 9:19 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

David A. Kruse
Kruse & Kruse P.C.
Auburn, Indiana

ATTORNEYS FOR APPELLEE

R. Jay Taylor, Jr.
Carla R. Hounshel
Scopelitis, Garvin, Light, Hanson & Feary, P.C.
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

James Kevin Arington,

*Appellant-Plaintiff,*

v.

Eaton's Trucking Service, Inc.,

*Appellee-Defendant,*

April 20, 2020

Court of Appeals Case No. 19A-EX-1732

Appeal from the Indiana Worker's Compensation Board

The Honorable Linda Peterson Hamilton, Chairman

Application No. C-229754

**Robb, Judge.**

# Case Summary and Issues

[1] James Arington appeals the decision of the Full Worker's Compensation Board (the "Board") affirming the decision of a single hearing member who concluded that Arington was ineligible for further worker's compensation benefits. The Board also denied Arington's claims against his employer for bad faith and lack of diligence, among other claims. This case presents several issues, which we expand and restate as: 1) whether the Board erred in affirming the single hearing member's determination, 2) whether the evidence supports the Board's conclusion that Arington's employer did not act in bad faith, and 3) whether the employer is entitled to appellate attorney fees. We conclude that the Board properly affirmed the single hearing member's decision that Arington was ineligible for further benefits and that Arington did not prove his employer acted in bad faith. We also decline to award attorney fees to his employer. Accordingly, we affirm.

# Facts and Procedural History

[2] Arington is an employee of Eaton's Trucking Service, Inc. ("Eaton's"). Arington's duties are to load semi-trucks from rail cars and drive the trucks to a designated factory. This case arises from an injury Arington suffered on November 11, 2014 in the course of his employment and the subsequent Application for Adjustment of Claim he filed on July 24, 2015. Arington also made claims against Eaton's for lack of due diligence and bad faith, among other claims. *See* Exhibits, Volume III at 5-6.

[3]     The relevant terms in this case are as follows:

- Temporary Total Disability ("TTD") – TTD payments are made to compensate an employee during the treatment period in which the employee cannot return to work of the same kind and character as before the injury. *Platinum Constr. Grp., LLC v. Collings*, 988 N.E.2d 1153, 1156-57 (Ind. Ct. App. 2013).

- Functional Capacity Evaluation ("FCE") – An FCE is conducted to determine an employee's capacity to perform work. *See* Exhibits, Vol. I at 91.

- Maximum Medical Improvement ("MMI") – MMI occurs when an injured employee reaches a state where his condition cannot be improved any further. *Cox v. Worker's Comp. Bd.*, 675 N.E.2d 1053, 1054 (Ind. 1996).

- Independent Medical Examination ("IME") – The purpose of an IME is to determine whether an employee's work-related injury has reached MMI. Appealed Order at 25.

- Permanent Partial Impairment ("PPI") – A PPI rating is assessed after a person has reached MMI such that the permanent impairment from the injury can be determined. *Stump Home Specialties Mfg. v. Miller*, 843 N.E.2d 18, 22 (Ind. Ct. App. 2006).

During the course of his treatment, Arington saw the following doctors, among others:

- Dr. Thomas Lazoff – Dr. Lazoff specializes in pain management, physical medicine & rehabilitation, and pain medicine. Eaton's directed Arington to receive treatment from Dr. Lazoff, who referred Arington to Dr. Johnathan Norton.

- Dr. Johnathan Norton – Dr. Norton specializes in reconstructive foot and ankle care. Arington visited Dr. Norton at the request of Dr. Lazoff.

- Dr. Shawn Kidder – Dr. Kidder is Arington's primary care physician who specializes in family medicine. Arington visited Dr. Kidder on his own.

- Dr. Amanda Vujovich – Dr. Vujovich specializes in foot and ankle care. Arington sought Dr. Vujovich's opinion on his own.

- Dr. Michael Shea – Dr. Shea specializes in bone, joint, spine, and muscle care. The Board appointed Dr. Shea to conduct the IME on Arington. Dr. Shea recommended that Arington undergo an EMG.

- Dr. Mark Reecer – Dr. Reecer is an EMG specialist. Eaton's initially chose Dr. Reecer to perform the EMG on Arington.

[5]     On November 11, 2014, while loading a truck in the course of his employment, Arington injured his right ankle.[1] Although Arington reported immediate pain, he did not go to the hospital until the next day. There, he was diagnosed with a sprained right ankle. The clinic notes suggest that Arington may have rolled his ankle a second time after the work injury. Reportedly, Arington has ongoing personal conditions such as arthritis, spurs, and osteochondritis affecting both of his ankles. Eaton's had notice of Arington's work injury and provided medical and TTD benefits while he was off work and seeking treatment. Arington received treatment from several medical providers for his work injury. In December of 2014, Arington was examined by Dr. Lazoff at the request of Eaton's. Dr. Lazoff recommended that Arington undergo an MRI of his injured right ankle. Arington's MRI results revealed no fracture or significant tissue abnormality; however, there were injuries to his ligaments. *See* Exhibits, Vol. I at 51-52. Arington was restricted from commercial driving and advised to wear an air cast boot. Dr. Lazoff then referred Arington to Dr. Norton, a foot and ankle specialist.

[6]     On January 7, 2015, Arington sought treatment from Dr. Norton. Dr. Norton opined that surgery to Arington's right ankle was not necessary despite his partially torn ligaments because he did not suffer a complete tear of the deltoid. Dr. Norton also restricted Arington from commercial driving but advised him

---

[1] The fact that Arington was injured in the course of his employment is not disputed.

that he could sit at work.[2] Arington had a follow up with Dr. Norton in February. At this time, Arington complained about pain in both ankles but Dr. Norton advised Arington that his left ankle pain was not related to his work injury. Dr. Norton also explained to Arington that his right ankle would never be 100% no matter what treatment he receives. In the same month, Arington had a follow up with Dr. Lazoff. He also indicated that Arington would not likely have complete relief from his ankle injury given his chronic ankle conditions and lack of improvement to date. Arington then returned to Dr. Norton on March 3, 2015. Arington mentioned visiting "Dr. Hicks" from South Bend, Indiana for treatment, but Dr. Norton was unable to locate a doctor by that name; Dr. Norton believed that Arington was being misleading. Dr. Norton then gave Arington an injection in his right ankle to relieve some of his pain. Dr. Norton advised Arington that "most people would have already been back to work with this problem." *Id*. at 73.

[7]     On March 4, Arington had a follow-up with Dr. Lazoff. Dr. Lazoff informed him that there was no further treatment to offer and explained that it was doubtful that surgical intervention would help; Dr. Lazoff recommended that Arington undergo an FCE. Before Arington underwent the FCE, he sought treatment from Dr. Kidder, his primary care physician, on March 13. Arington told Dr. Kidder that he wanted to discontinue wearing his air cast boot. Arington also told Dr. Kidder that he had collapsed after receiving the injection

---

[2] The record is unclear if Arington returned to work on this restrictive basis.

from Dr. Norton. Dr. Kidder opined that Arington's injury required surgical repair and that he would sustain 100% impairment to his right ankle without surgery. On April 7, Arington followed up with Dr. Norton and mentioned that he had collapsed from the injection. Dr. Norton consulted with Dr. Lazoff regarding this issue and both concluded that the injection would not have caused the side effects that Arington had reported.

[8] On April 14, Arington underwent the FCE recommended by Dr. Lazoff. Although Arington stated that he was unable to perform work, the evaluator noticed that Arington's fingernails were "soiled and [he had] a fair amount of callus formation . . . on both hands." *Id.* at 144. The evaluation indicated that Arington was "attempting to control the test results to demonstrate more pain and disability than are actually present[.]" *Id.* at 151. Nonetheless, the evaluation showed that Arington's ankle "has returned to normal or near normal function" and that he is able to work at medium physical demand for an eight-hour day. *Id.* at 144.

[9] Arington continued to visit medical providers. On April 16, he sought treatment from Dr. Douglas Bolda on his own. Dr. Bolda did not have a surgical procedure that would help Arington's ankle but recommended that Arington seek treatment from Dr. Karr, a foot and ankle specialist. At a follow-up appointment, Dr. Bolda asked Arington if he saw Dr. Karr; Arington responded that he did not because his insurance would not allow him to see Dr. Karr. Arington then said that he really did not want to see Dr. Karr because he had seen Dr. Karr in the past.

[10] On April 20, Arington had a follow-up appointment with Dr. Lazoff. At this appointment, Dr. Lazoff reported to Arington that his work injury had reached a point of MMI and that there was no permanent impairment to his right ankle based on his FCE results. Arington submitted a letter to Eaton's objecting to his FCE results and claiming that the results were inaccurate because the evaluator reported that he was not wearing his air cast boot. Nonetheless, in light of the reports from Drs. Norton and Lazoff, the results of Arington's FCE, and his MMI status, Eaton's notified Arington of its intent to terminate Arington's TTD benefits as of May 4, 2015. As of May 4, Eaton's had paid a total of $10,313.118 in TTD benefits to Arington.

[11] Arington then requested an IME pursuant to Indiana Code section 22-3-3-7 to validate the opinions of Drs. Norton and Lazoff. The Board appointed Dr. Shea to perform the IME to determine whether Arington had reached MMI. *See id*., Vol. IV at 59-60. Before undergoing the IME, Arington continued to visit various doctors. Among those, Arington sought treatment from Dr. Vujovich, a foot and ankle specialist. Arington indicated that he wanted surgery. However, after examining Arington's ankle injury, Dr. Vujovich advised against surgery.

[12] Arington then underwent the IME on July 6, 2015. Dr. Shea determined that his injuries were fairly unremarkable. Dr. Shea averred that Arington had received appropriate care to date, recommended an Electromyography

("EMG") test[3] on his right ankle to rule out any peroneal nerve issues, and opined that Arington was most likely at MMI if his EMG test was negative for any peroneal nerve injury. *See id.*, Vol. I at 166. Dr. Shea also reported:

> At this point in time, I think he could return to just driving but I think he would have a little difficulty climbing up and down a semi cab, as well as he would have great difficulty loading and unloading, as well as doing any tarp or climbing on the semi. If it was just driving . . . I think it would be reasonable for him to return to that.

*Id.* In September of 2015, Arington had a follow-up with Dr. Vujovich who issued a report disagreeing with Dr. Shea's recommendation that Arington should undergo an EMG test, explaining that her physical exam findings did not show any signs of peroneal nerve injury. *See id.*, Vol. II at 247. Dr. Kidder issued a report agreeing with Dr. Vujovich's assessment stating, "I entrust [Arington's] care to Dr. Vujovich as she specializes in this area . . . I do confer with Dr. Vujovich's plan of care." *Id.*, Vol. III at 69.

[13]     Nevertheless, the Board instructed Eaton's to schedule the EMG test by their choice of physician. The nurse case manager ("NCM")[4] on the case then

---

[3] An EMG is a test that checks muscle and nerve health. *See* Healthline, *Electromyography*, http://www.healthline.com/health/electromyography [https://perma.cc/C7PK-QPEZ].

[4] A NCM is a liaison between the medical providers, the employer, and the injured worker. The NCM's role in worker's compensation cases includes providing information and communication among the parties and medical providers, scheduling appointments, helping to facilitate care, and reporting back to the employer. *See* Worker's Compensation Board of Indiana, *Nurse Case Manager Guidelines*, https://www.in.gov/wcb/2585.htm [https://perma.cc/3WG7-FXTZ].

assisted Eaton's with arranging an EMG with Dr. Reecer to take place on August 4. Arington submitted a letter to Eaton's requesting a different doctor because he previously had a dispute with Dr. Reecer. *See id*. at 18. Eaton's, however, declined and stated that it had "the right to direct medical treatment under Indiana law." *Id*., Vol. VI at 162. In any event, Arington attended the appointment but refused to undergo the EMG. Arington believed that Dr. Shea had examined his left ankle when recommending the EMG and wanted confirmation that the EMG was for his right ankle before undergoing the EMG. Despite multiple confirmations by Dr. Reecer that the EMG was for the right ankle, Arington refused to undergo the test. An employee with Dr. Reecer's office characterized Arington's behavior as "disruptive and belligerent." *Id*., Vol. III at 93. Finally, Dr. Reecer told Arington that he would reschedule the EMG and obtain a specific order from Dr. Shea confirming the test was to be conducted on the right ankle, which Dr. Shea subsequently provided. Because of Arington's "refusal or obstruction" of the EMG, Eaton's filed a notice to suspend Arington's medical benefits the same day. *Id*. at 7.

[14] Nonetheless, Eaton's directed the NCM to reschedule the EMG with a different doctor. The NCM then rescheduled the EMG test with Dr. Todd Graham. Eaton's informed Arington that if he failed to attend or refused to undergo the EMG test his medical and TTD benefits would not be reinstated. However, Arington filed an objection to the EMG test relying on the opinions of Drs. Vujovich and Kidder claiming there was no peroneal nerve injury and therefore

an EMG was not medically warranted. The parties submitted the question of whether an EMG was necessary to the Board.

[15] On December 1, a single hearing member of the Board held an interim hearing on issues related to the IME. The single hearing member concluded that Eaton's did not wrongfully terminate TTD benefits and that the EMG test was not required based on Arington's contention that the right peroneal nerve injury was ruled out as a work-related injury. *See* Appellant Appendix, Volume 2 at 56-57. Arington appealed to the Board for review and the Board affirmed the single hearing member's judgment on April 14, 2016.

[16] A hearing was held before a single hearing member of the Board on January 23, 2018 on Arington's Application for Adjustment of Claim regarding medical benefits and compensation. The single hearing member entered its findings of fact and conclusions thereon on April 27. Pursuant to its findings and conclusions, the single hearing member awarded Arington additional compensation for TTD commencing on May 5, 2015 and ending on August 4, 2015 for a total of $5,448.68. The single hearing member also awarded Arington compensation for 5% PPI for a total award of $2,654.75. Arington appealed the decision to the Board. On October 4, 2018, the Board adopted and affirmed the single hearing member's decision. Arington's remaining claims for bad faith, lack of diligence, and independent torts pursuant to Indiana Code section 22-3-4-12.1 went before the Board on April 30, 2019. The Board concluded that Arington did not meet his burden of showing that Eaton's acted

in bad faith, lacked due diligence, or committed independent torts. Arington now appeals. Additional facts will be supplied as necessary.

# Discussion and Decision

## I. Standard of Review

The Indiana Worker's Compensation Act ("the Act") provides compensation for personal injury or death arising out of and in the course of employment. Ind. Code § 22-3-2-2(a). Our supreme court has held that the Act is to be liberally construed to "'effectuate the humane purposes of the Act[.]'" *Daugherty v. Indus. Contracting & Erecting*, 802 N.E.2d 912, 919 (Ind. 2004).

Arington had the burden to prove a right to compensation under the Act. *Bowles v. Gen. Elec.*, 824 N.E.2d 769, 772 (Ind. Ct. App. 2005), *trans. denied*. As such, he appeals from a negative judgment. In reviewing a negative judgment, we are bound by the factual determinations of the Board and may not disturb them unless the evidence is undisputed and leads inescapably to a contrary conclusion. *Triplett v. USX Corp.*, 893 N.E.2d 1107, 1116 (Ind. Ct. App. 2008), *trans. denied*. We neither reweigh the evidence nor judge the credibility of the witnesses. *Kovatch v. A.M. Gen.*, 679 N.E.2d 940, 942-43 (Ind. Ct. App. 1997), *trans. denied*. Instead, we examine the record only for substantial evidence and reasonable inferences that can be drawn therefrom supporting the Board's findings and conclusions. *Christopher R. Brown, D.D.S., Inc. v. Decatur Cty. Mem'l Hosp.*, 892 N.E.2d 642, 646 (Ind. 2008). The Board has a duty to issue findings

that reveal its analysis of the evidence and that are specific enough to permit intelligent review of its decision. *Perkins v. Jayco*, 905 N.E.2d 1085, 1088 (Ind. Ct. App. 2009).

## II. Termination of Worker's Compensation Benefits

Arington contends that the Board erred in finding that his TTD benefits should be terminated on August 4, 2015 because he still needed medical treatment after that date. We disagree. When an employee is injured on the job, the employer must furnish medical care to treat the worker's injury. Ind. Code § 22-3-3-4(a). If the injured worker does not have the ability to return to work of the same kind or character during the treatment period for the injury, the worker is temporarily totally disabled and may be entitled to benefits. *Ballard v. Book Heating & Cooling, Inc.*, 696 N.E.2d 55, 57 (Ind. Ct. App. 1998), *trans. denied*.

Once the injury has reached a permanent and quiescent state, the treatment period ends, and the extent of the permanent injury is assessed for compensation purposes. *Cavazos v. Midwest Gen. Metals Corp.*, 783 N.E.2d 1233, 1239 (Ind. Ct. App. 2003). "The phrase 'maximum medical improvement,' also designated 'quiescence' in the jargon of worker's compensation, essentially means that a worker has achieved the fullest reasonably expected recovery with respect to a work related injury." *Perkins*, 905 N.E.2d at 1088-89. However, before an employer terminates TTD benefits, the employer must provide written notice to the worker of its intent to discontinue benefits. Ind. Code § 22-3-3-7(c). Indiana Code section 22-3-3-7(c) also provides in relevant part:

. . . If the employee disagrees with the proposed termination, the employee must give written notice of disagreement to the board and the employer within seven (7) days after receipt of the notice of intent to terminate benefits. . . . If the board is unable to resolve the disagreement within ten (10) days of receipt of the notice of disagreement, the board shall immediately arrange for an evaluation of the employee by an independent medical examiner. The independent medical examiner shall be selected by mutual agreement of the parties or, if the parties are unable to agree, appointed by the board under IC 22-3-4-11. If the independent medical examiner *determines that the employee is no longer temporarily disabled or is still temporarily disabled but can return to employment that the employer has made available to the employee*, or if the employee fails or refuses to appear for examination by the independent medical examiner, temporary total disability benefits may be terminated.

(Emphasis added.)

[21] Eaton's contends that the Board's decision that Arington's TTD benefits should terminate on August 4 was correct because his condition had reached MMI as of that date. Eaton's terminated Arington's TTD benefits on May 4, 2015 based on evidence that Arington's injury had reached MMI. When Arington injured himself, he did not go to the hospital until the next day, despite his report of immediate pain. Instead, he continued to work. At the hospital, he was diagnosed with having a sprained right ankle, but the clinic notes suggest that Arington may have rolled his ankle a second time after the work injury occurred. Nonetheless, Arington's MRI results revealed no fracture or significant tissue abnormality, although there were injuries to the ligaments of his right ankle. At that time, Arington was advised only to wear an air cast

boot. Arington then sought treatment from Dr. Norton. Dr. Norton opined that surgery was not necessary because Arington did not suffer a complete ligament tear but restricted him to sit down work. Eventually, Dr. Norton explained to Arington that he had no further treatment to offer him and agreed to see him on an as-needed basis. Dr. Norton also opined that Arington should have been able to return to work with his injury. Dr. Norton's opinion was supported by Arington's FCE results that showed he was able to work at medium physical demand for eight-hour days. The FCE test also suggested that Arington's injured right ankle had returned to normal or near normal function. After seeing Arington on April 20, Dr. Lazoff reported to Eaton's that Arington's condition had reached MMI and that Arington had sustained no permanent impairment to his right ankle. Eaton's then notified Arington it would be terminating his TTD benefits as of May 4, 2015.

[22] Arington then requested a Board-appointed IME. After conducting Arington's IME, Dr. Shea had a similar report to that of Drs. Norton and Lazoff – that Arington had appropriate care and that his injury was likely at MMI. Although Dr. Shea believed that Arington would have difficulty loading his truck and climbing up and down to get in and out of the cab, he reported that Arington could still return to work but would be limited to only driving. However, Dr. Shea still recommended an EMG to rule out any peroneal nerve injury, because a negative result would confirm he was at MMI. Arington was scheduled for an EMG on August 4, 2015 but refused to undergo the EMG on that date. It is at this point that Eaton's suspended Arington's medical benefits because of

Arington's refusal. Nonetheless, Eaton's and the NCM arranged a second EMG, but instead of undergoing the procedure, Arington conceded that peroneal nerve injury was ruled out as a compensable consequence of his work injury based on reports from Drs. Vujovich and Kidder.

[23] Arington's own concession, the reports from Arington's medical providers, and Arington's IME report support the inference that Arington's injury had reached MMI by August 4 at the latest and he could return to work. There were no medical opinions by any foot and ankle specialist that surgery would be advisable for Arington, despite his wishes. We do not discredit the magnitude of Arington's work injury. However, his continued pain was not only from his work injury. Instead, his preexisting medical conditions, namely arthritis, spurs, and osteochondritis, were also contributing factors for his pain as noted by medical providers. Furthermore, Arington's misrepresentations undermine his credibility with respect to the severity of his injury. At one point, Arington mentioned seeking treatment from "Dr. Hicks" from South Bend, Indiana, but Dr. Norton was unable to locate a doctor by that name; Dr. Norton believed Arington was being misleading. Dr. Norton also gave Arington an injection which Arington claimed caused him to collapse. However, Drs. Norton and Lazoff concluded that the injection would not have had that effect. Also, Dr. Bolda asked Arington if he saw Dr. Karr as Dr. Bolda had suggested; Arington responded that he did not because his insurance would not let him see Dr. Karr. But then Arington changed his story and said that he really did not want to see Dr. Karr because he had seen Dr. Karr in the past. Moreover, Arington claimed

that he had not been working but his FCE evaluator believed otherwise because his fingernails were soiled and both hands had calluses. Arington's FCE report also indicated he was "attempting to control the test results to demonstrate more pain and disability than are actually present." Exhibits, Vol. I at 151. Because of these misrepresentations, it is difficult to believe that Arington was sincere in his representations as to the severity of his injury or his inability to return to work.

[24] Although Arington argues that there is evidence in the record supporting his need for additional medical treatment, his argument is simply an invitation for us to reweigh the evidence and judge his credibility against that of the medical providers, an invitation that we cannot accept. *See Kovatch*, 679 N.E.2d at 942-43. Based on our review, there is sufficient evidence in the record to show that Arington's condition has reached MMI and thus, the Board did not err in finding that Arington's TTD benefits should terminate on August 4, 2015.

[25] Although Arington believes no PPI rating should have been assigned because he had not yet reached MMI, a claim we have decided against his position, he also argues that the Board abused its discretion in determining that he sustained 5% impairment to his right ankle. PPI benefits are awarded because of "the partial or total loss of the function of a member or members of the body or the body as a whole." *Bowles v. Griffin Indus.*, 798 N.E.2d 908, 910 (Ind. Ct. App. 2003). Therefore, "the aim of a PPI determination is to decide what parts of an employee's body have lost their proper function and to what extent." *Id*. Appellate review of the Board's assessment of a worker's PPI rating is limited

and, as with all matters entrusted to the Board's discretion, the Board's decision must be affirmed if it is supported by the evidence. *Bethlehem Steel Corp. v. Dipolito*, 168 Ind. App. 417, 424, 344 N.E.2d 67, 71 (1976).

[26] The Board reached the following conclusion concerning Arington's PPI rating:

> 14. . . . Dr. Norton reported that [Arington] was unlikely to achieve 100% improvement. Dr. Lazoff reported that [Arington] sustained no impairment. [Arington]'s primary care physician, Dr. Kidder, reported that [Arington] had lost 100% of the use of his right lower extremity. [Arington] has not suffered a complete loss of use of his right foot. Based on those opinions, and pursuant to the discretion afforded at Ind. Code § 22-3-3-10(i)(14), the Board concludes that [Arington] sustained a five percent (5%) impairment to the right foot due to injuries related to the November 11, 2014 accidental injury.

Appealed Order at 18, ¶14. Arington argues that the Board should not have considered Dr. Lazoff's zero percent PPI rating because it was based on the FCE report and that report fraudulently reported that he was not wearing his boot during the exam. *See* Brief of Appellant at 42; *see also* Exhibits, Vol. III at 36-37. However, the FCE evaluator confirmed that whether "the client wore a boot during the FCE is irrelevant since the validity criteria of this test is based on the client's ability to constantly put forth his/her best effort. The boot has no bearing on this." Exhibits, Vol. I at 163.[5] Therefore, Dr. Lazoff's opinion was

---

[5] Arington appears to have misinterpreted the report in claiming that the report falsely indicated that he did not have his boot on during the evaluation. The report does not state that Arington did not wear the boot.

not based on a fraudulent report. Nevertheless, Arington's challenge appears to be solely to the credibility of the physicians, and we neither reweigh the evidence nor judge the credibility of the witnesses. *See Kovatch*, 679 N.E.2d at 942-43. Arington claims that the PPI rating should be 100%, but based on the evidence, Arington has not suffered a complete loss of use of his right foot. There is sufficient evidence to support the Board's conclusion that Arington suffered 5% impairment to his right ankle and therefore, the Board did not abuse its discretion in assigning a PPI rating.

## III. Bad Faith and Lack of Diligence

[27] Arington next argues that the Board erred in concluding there was insufficient evidence to find that Eaton's had engaged in bad faith and acted with a lack of diligence. Indiana Code section 22-3-4-12.1(a) provides that the Board "has the exclusive jurisdiction to determine whether the employer, the employer's worker's compensation administrator, or the worker's compensation insurance carrier has acted with a lack of diligence, in bad faith, or has committed an independent tort in adjusting or settling the claim for compensation." Our courts have made it clear that "bad faith" and "lack of diligence" are distinct allegations. "[A] finding of bad faith requires evidence of a state of mind reflecting a dishonest purpose, moral obliquity, furtive design, or ill will. Poor judgment and negligence . . . do not amount to bad faith; the additional element

---

Instead, it states that he was observed both with and without his boot. In any event, whether he had the boot on or not does not matter as indicated by the evaluator's statement.

of conscious wrongdoing must be present." *Ag One Co-op v. Scott*, 914 N.E.2d 860, 864 (Ind. Ct. App. 2009) (quotation and citation omitted). However, "a lack of diligence requires no conscious wrongdoing by the actor." *Eastern Alliance Ins. Grp. v. Howell*, 929 N.E.2d 922, 926-27 (Ind. Ct. App. 2010) (footnote omitted).

> To act with "diligence" is to act with "caution or care" or "the attention and care required of a person." Hence, to act with a "lack of diligence" is to act without the degree of attention and care required of a person. Stated affirmatively, a lack of diligence is a failure to exercise the attention and care that a prudent person would exercise. That is, to act with a lack of diligence is to act negligently.

*Id*. at 927 (citation and footnote omitted). The burden is on Arington to prove that Eaton's acted in bad faith. *Borgman v. Sugar Creek Animal Hosp.*, 782 N.E.2d 993, 998 (Ind. Ct. App. 2002), *trans. denied*.

[28] Arington's argument on appeal seems to conflate "lack of diligence" and "bad faith," but focuses primarily on bad faith. Therefore, we will only address the bad faith claim he presents on appeal. The Board concluded that there was no evidence indicating that Eaton's or its insurance adjuster acted in bad faith. On appeal, Arington presents several arguments as to how he believes that Eaton's acted in bad faith: 1) concealing evidence related to allegations that Arington was "disruptive and belligerent" at Dr. Reecer's office before the EMG, 2) providing an illegal and fraudulent EMG prescription for his left leg, and 3)

falsely claiming that Eaton's had a right to direct medical treatment. *See* Br. of Appellant at 25-26.

[29] First, Arington argues that Eaton's acted in bad faith by improperly concealing documents showing how he was acting in a "disruptive and belligerent" manner at Dr. Reecer's office for the first scheduled EMG. *Id*. at 26-27. He contends that production of these documents would have shown that he did not engage in that behavior and that Eaton's improperly suspended his benefits for that reason. The record shows that Eaton's suspended Arington's benefits because he refused or obstructed the examination, not because of an allegation of "disruptive" or "belligerent" behavior as Arington contends. *See* Appellant's App., Vol. 3 at 39. As such, any documents showing such behavior did not have any bearing on Eaton's termination of his benefits and therefore, the Board did not err in concluding that Eaton's did not act in bad faith.

[30] Second, Arington argues that Eaton's provided an illegal and fraudulent EMG prescription. Specifically, he contends that his EMG prescription instructed Dr. Reecer to perform an EMG of Arington's "clutch leg" (left leg) instead of his right leg and that the NCM illegally altered the EMG prescription. Br. of Appellant at 50; *see also* Exhibits, Vol. I at 166. At the first EMG appointment, Arington emphasized that the order indicated the EMG was to be performed on his left leg instead of his right leg. Arington did not want to undergo the EMG unless this was corrected despite Dr. Reecer informing him that the EMG was in fact ordered for his injured leg. At the December 1, 2015 hearing, the NCM testified that she did not modify any EMG order; rather, she called Dr. Shea's

office and confirmed that the EMG was to be conducted on Arington's right lower foot. *See* Transcript, Volume I at 74-75. In any event, Dr. Shea clarified his order and issued a written order for a second EMG on Arington's *right* leg. *See* Exhibits, Vol. I at 168. Arington has failed to show Eaton's engaged in ill will regarding his EMG prescription and therefore, the Board did not err in concluding that Eaton's did not act in bad faith.

[31] Last, Arington argues that Eaton's falsely claimed that it had a right, under the Act, to direct his medical treatment. We disagree. In an August 4, 2015 letter, Eaton's declined Arington's request to change doctors for the EMG, noting that it had a right to direct his medical treatment. Indiana courts have long held that the employer or the employer's insurer chooses the treating physician instead of the employee. *Furno v. Citizens Ins. Co. of Am.*, 590 N.E.2d 1137, 1140 (Ind. Ct. App. 1992) ("Because the employer or insurer has the statutory right to select the treating physician, [employer's] choice of a different physician for [employee] was not an illegal act."), *trans. denied*. Therefore, Eaton's was well within its authority to direct medical treatment for Arington. Arington has failed to show any ill will by Eaton's in asserting or exercising this right and therefore, the Board did not err in concluding that Eaton's did not act in bad faith.[6]

---

[6] Arington also argues that his due process rights were violated when the Board did not order Eaton's to provide all discovery, including unredacted NCM notes, claim notes, and a doctor's prescription. *See* Br. of Appellant at 21. Generally, parties may obtain discovery of any nonprivileged matter relevant to the subject

In sum, Arington has failed to meet his burden in showing that Eaton's acted with ill will or with conscious wrongdoing. Therefore, the Board did not err in concluding that Eaton's did not act in bad faith.

# IV. Appellate Attorney Fees

Eaton's requests that we assess sanctions in the form of attorney fees against Arington for his "reckless and spurious accusations of fraud, professional misconduct, and criminality." Amended Brief of Appellee at 30. This court may assess attorney fees if an appeal is frivolous or in bad faith. *See* Ind. Appellate Rule 66(E). Our discretion to award attorney fees under this rule is limited to instances when an appeal is permeated with meritlessness, bad faith, frivolity, harassment, vexatiousness, or purpose of delay. *Townsend v. Townsend*, 20 N.E.3d 877, 880 (Ind. Ct. App. 2014), *trans. denied*. And although our authority to award damages on appeal is discretionary, "we must use extreme restraint when exercising this power because of the potential chilling effect upon the exercise of the right to appeal." *Id*. It is not intended to "punish mere lack of merit, but something more egregious." *Helmuth v. Distance Learning Sys. Ind., Inc.*, 837 N.E.2d 1085, 1094 (Ind. Ct. App. 2005). After review of Arington's

---

matter involved in the pending litigation. *Mulder v. Vankersen*, 637 N.E.2d 1335, 1337 (Ind. Ct. App. 1994), *trans. denied*. "A denial of a request for discovery in itself is not a violation of due process protection." *Burke v. City of Anderson*, 612 N.E.2d 559, 565 (Ind. Ct. App. 1993), *trans. denied*. Over Eaton's objection, the Board issued a discovery order for Eaton's to tender unredacted copies of the NCM's notes for *in camera* review. *See* Appellant App., Vol. 2 at 164. Thereafter, Eaton's provided the required documents to the Board. The Board then issued a second discovery order requiring Eaton's to produce unredacted NCM notes and partially redacted copies of the claim notes to Arington if it had not already done so. *See id.*, Vol. 4 at 48. Eaton's then provided the required discovery to Arington and notified the Board that it had complied with the order. *See id.* at 50-95. Based on our review, there was no violation of Arington's due process rights.

brief, it does not appear to be "laced with unseemly invective" and "filled with unsupported accusations of conspiracies" as Eaton's contends. Amended Br. of Appellee at 33. Arington's brief does not overstep the bounds of zealous advocacy. Therefore, we can discern no basis for awarding attorney fees to Eaton's.

# Conclusion

[34] The Worker's Compensation Act is to be liberally construed in order to effectuate its humane purpose, and even with this purpose in mind, we conclude these facts do not inescapably lead to a conclusion opposite the Board's decision that Arington's benefits properly terminated on August 4, 2015 or that his PPI rating was 5%. We also conclude that Arington has not proven that Eaton's acted in bad faith. Therefore, we affirm the decision of the Board. We also conclude that Eaton's is not entitled to attorney fees.

[35] Affirmed.

Bradford, C.J., and Altice, J., concur.